**UNITED STATES COURT OF APPEALS**
**FIFTH CIRCUIT**

_____

No. 01-20102
_____

UNITED STATES OF AMERICA,

　　　　　　　　　　　　　　Plaintiff-Appellee,

versus

MARCIAL RIVERA,

　　　　　　　　　　　　　　Defendant-Appellant.

Appeal from the United States District Court
For the Southern District of Texas

June 19, 2002

Before EMILIO M. GARZA, BENAVIDES, and STEWART, Circuit Judges.

EMILIO M. GARZA, Circuit Judge:

Defendant-Appellant Marcial Rivera was indicted for seven counts of aiding and abetting wire fraud in violation of 18 U.S.C. §§ 2 and 1343, for conspiracy to launder monetary instruments in violation of 18 U.S.C. § 1956(h), for aiding and abetting money laundering in violation of 18 U.S.C. §§ 2 and 1956(a)(1)(A)(i), and for threatening to retaliate against an informant in violation of 18 U.S.C. § 1513(b)(2). He was tried by a jury and convicted on all charges except for threatening to retaliate against an informant. The district court then sentenced him to concurrent terms of fifty-

seven months' imprisonment on each count. On appeal, Rivera challenges the sufficiency of the evidence supporting his conviction. In addition, Rivera argues that the prosecutor committed reversible error by commenting on his post-*Miranda* silence and that the district court abused its discretion in denying his motion for a new trial because of juror misconduct.

**I**

Rivera and Robert Swanson were co-owners of a Houston business known as the Watch Shop.[1] The Watch Shop specialized in luxury watches as well as gold and other jewelry. In 1998, the Watch Shop was in serious financial trouble. By September 1999, one of the store's bank accounts, which was under Swanson's name, had a negative balance of more than $21,000. Swanson also was overdrawn significantly on his personal accounts, at one point averaging at least $1,000 per week in overdraft charges.

Beginning in March of 1998, several persons reported large, unauthorized charges made at the Watch Shop to credit cards that had been lost or stolen. First, Ernest Albers, after losing his corporate card, received a statement reflecting an unauthorized $7,398 charge at the Watch Shop. Albers contacted his credit card company, Mastercard, which in turn contacted Electronic Fleet Systems ("EFS"), the credit card processing center for the Watch Shop.[2] Mastercard requested that

---

[1]An entity known as MRB Investments, Inc. owned 50% of the Watch Shop. Rivera was president of MRB, which he apparently owned along with his brother, Sergio Rivera.

[2]EFS is an electronic credit card processor for merchants. Merchants process or "swipe" cards electronically through electronic credit card terminals installed at the merchant's business. When the merchant swipes a customer's card and enters the purchase amount, the information is wired electronically to EFS. EFS then wires the card's issuing bank for an authorization code. The authorization code is then sent to the merchant. This informs the business that the card is not stolen or overdrawn. If the automatic electronic imprint fails to register, the merchant takes a physical imprint of the card and manually types in the credit card number. Whether the card is processed electronically or manually, the customer then signs the imprint from the terminal.

EFS make a chargeback request. In response to the EFS request, the Watch Shop supplied an unsigned copy of the credit card draft that had been manually entered into the electronic terminal and the imprinted sales receipt. EFS did not charge the Watch Shop and Mastercard suffered the loss on behalf of their customer.

Less than two weeks later, Doil Crabtree received a credit card statement revealing two unauthorized charges at the Watch Shop for $3,409 and $5,196. The issuing bank again made a chargeback request to EFS. EFS contacted the Watch Shop and spoke with Rivera. Rivera then supplied both a manually entered credit card draft and a signed sales receipt for both charges. Again, the issuing bank suffered the loss for the fraudulent purchases. Two other persons, Anthony Harper and Kenneth Vaughn, subsequently reported similar unauthorized charges on their credit cards at the Watch Shop. In each instance, Rivera provided EFS with documentation supporting the charges. The Watch Shop received payment on these charges as well.[3]

Linett Wilkerson, an actual customer of the store, also reported unauthorized charges originating at the Watch Shop on her account. Wilkerson purchased a watch from the store in December 1998 for $2,700. She paid $500 in cash and had the remaining $2,200 charged on her

---

After receiving the purchase information, EFS sends the merchant the money charged and collects from the issuing bank. It usually takes two or three days for the merchant to receive the money charged. If a customer contests a charge, the issuing bank can issue a "chargeback" to EFS. When the issuing bank sends EFS a chargeback, it provides EFS with a debit along with supporting documentation contesting the charge. EFS then notifies the merchant of the dispute. The merchant must either agree to the chargeback or contest it by providing proper documentation of the charge. If the merchant follows the proper charge procedure, the merchant is paid for the transaction and the issuing bank is held responsible for the fraudulent or unauthorized transaction.

[3]Several other persons also reported unauthorized charges on their credit cards at the Watch Shop. These additional unauthorized charges all occurred in a similar pattern. It is not clear from the record, however, who sent the documentation for those charges to EFS.

credit card. Swanson, who conducted the sale, asked Wilkerson to sign a blank charge card draft. Wilkerson pointed out that the charge slip was blank, but signed the form anyway. Wilkerson then received a credit card statement reflecting an additional $8,000 charge against her account on the same day as the purchase. Wilkerson disputed the additional charge. After failing several times to reach Swanson over the phone, Wilkerson went to the Watch Shop and spoke with Rivera. Wilkerson told Rivera that she had not made the additional $8,000 purchase and disputed the charge. Following the conversation, Rivera then supplied EFS with a proof of purchase in the form of a signed receipt. The signature Rivera provided to support the $8,000 charge exactly matched Wilkerson's signature on the blank copy that she used when purchasing the watch at the store. When Wilkerson and her credit card issuer conference-called the store, Swanson denied ever sending any documentation to EFS to support the charge. Ultimately, the $8,000 was charged back to the Watch Shop.

Three months prior to the Wilkerson charges, the Houston Police Department received a "Crime Stoppers" report alleging that Swanson was operating in stolen property and credit cards. John Dziejak, a recovering cocaine and alcohol addict, filed the report with the police. Later, he admitted that he knew of the illegal activities in the store because he had previously brought stolen credit cards to Swanson. A few weeks prior to contacting the police, Dziejak had stolen several credit cards from James Bates at a methamphetamine party. Dziejak brought those cards to the Watch Shop and gave them to Swanson. Swanson then gave the cards to Rivera. Dziejak first told Rivera to swipe the card for $1,200. When this amount was declined, Rivera swiped the card for $750, which was approved. Rivera then swiped a second card for $500. Dziejak later received a portion of the fraudulent charges and a gold necklace worth $150.

Dziejak agreed to assist the police by acting as a confidential informer. The Secret Service, working with the Houston police, obtained three phony credit cards to use in the operation registered in the names of Catherine Chi, Oneida Suoto, and Sally Metz. The police then fitted Dziejak with a transmission device and a wire. Dziejak brought the Chi and Suoto cards to the Watch Shop on September 10, 1999. He told Swanson that he had stolen the cards. Swanson ran a charge for $866 on the Chi account and for $784.81 on the Suoto account. Rivera made the manual imprints of the Suoto charge. The next day, someone at the Watch Shop attempted to make further charges on the two cards, but they were declined because they exceeded each card's credit limit.

On September 14, 1999, Dziejak returned to the Watch Shop with the third phony credit card registered to Sally Metz. Dziejak first asked Swanson to charge an amount over the card's limit. When this was refused, Swanson tried a lower amount, which was approved. According to Dziejak, Rivera assisted in the transaction, instructing Rudolfo Ramirez, an employee at the Watch Shop, as to which credit card to process, as well as reading the authorization code to Swanson.

The following day, Dziejak returned to the Watch Shop to receive his percentage of the charges. While Dziejak waited, Swanson called someone on the telephone. Swanson told the person over the phone: "Oh, well, just give – unintelligible – a check, man. He ain't going to ask you. Well if you're at the bank now, just go ahead and get some cash. I need to give this guy some money that we just, uh, did a deal with him." Swanson made the call shortly after 12:05 P.M. At 12:13 P.M., banks records show that Rivera withdrew $850 from one of the Watch Shop's accounts (Account #1005391), the same account in which the credit card proceeds from the Chi and Suoto charges had been deposited. Several days later, Swanson paid Dziejak an additional $325 for the charges made on the Metz credit card.

**II**

Rivera first challenges the sufficiency of the evidence used to support his conviction for seven counts of aiding and abetting wire fraud, as well as for conspiracy and aiding and abetting money laundering. The standard for evaluating the sufficiency of the evidence is whether a rational jury, viewing the evidence in the light most favorable to the prosecution, could have found the essential elements of the offense beyond a reasonable doubt. *See Glasser v. United States*, 315 U.S. 60, 80 (1942); *see also United States v. Ortega-Reyna*, 148 F.3d 540, 543 (5th Cir. 1998). When reviewing the evidence, we draw all reasonable inferences in favor of the jury's verdict. *Glasser*, 315 U.S. at 80. We do not consider whether the jury correctly determined guilt or innocence, but whether the jury made a rational decision. *United States v. Jaramillo*, 42 F.3d 920, 923 (5th Cir. 1995). Nevertheless, if the evidence gives "equal or nearly equal circumstantial support to a theory of guilt or innocence, we must reverse the conviction, as under these circumstances a reasonable jury *must necessarily entertain* a reasonable doubt." *United States v. Garcia-Flores*, 246 F.3d 451, 454 (5th Cir. 2001) (quoting *United States v. Lopez*, 74 F.3d 575, 577 (5th Cir. 1999)) (emphasis in original) (citations omitted). Because the wire fraud and money laundering convictions require proof of distinct elements, we will address each separately.

**A**

Rivera argues that the evidence is insufficient to support his conviction for seven counts of aiding and abetting wire fraud (counts 2-8). In order to establish wire fraud, the government must prove beyond a reasonable doubt that the defendant: (1) engaged in a scheme to defraud and (2) used,

or caused the use of, wire communications in furtherance of that scheme. 18 U.S.C. § 1343.[4] In order to obtain a conviction for aiding and abetting wire fraud, however, the government does not have to establish that Rivera actually completed each specific act charged in the indictment. *United States v. Ismoila*, 100 F.3d 380, 387 (5th Cir. 1996). Instead, the government only has to establish that Rivera assisted the actual perpetrator of the wire fraud crimes while sharing the requisite criminal intent. *Id.*

A conviction for wire fraud requires proof of the specific intent to defraud or deceive. *Id.* Proof of such intent, however, can arise "by inference from all of the facts and circumstances surrounding the transaction." *Id.* (citing *United States v. Keller*, 14 F.3d 1051, 1056 (5th Cir. 1994)). Moreover, "once membership in a scheme to defraud is established, a knowing participant is liable for any wire communication which subsequently takes place or which previously took place in connection with the scheme." *United States v. Dula*, 989 F.2d 772, 778 (5th Cir. 1993). Thus, in order to convict Rivera for aiding and abetting wire fraud, the jury had to find that he willfully assisted in Swanson's wire fraud scheme with the specific intent to defraud and deceive.

Rivera essentially contends that he was unaware that any of the credit cards were stolen or that Swanson was engaging in any criminal activity. He argues, therefore, that the government failed

---

[4]18 U.S.C. § 1343 provides:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than five years, or both. If the violation affects a financial institution, such person shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both.

18 U.S.C. § 1343.

to prove that he had the necessary intent to be convicted of aiding and abetting the wire fraud scheme.

The government presented evidence that Rivera was part owner of the Watch Shop and aware of the operations of the business. The government also provided the jury with testimony establishing that Rivera was present and actively participated in making fraudulent charges to several credit card accounts. In one instance, Rivera swiped James Bates' stolen credit card for an amount for which authorization was declined. Rivera then immediately swiped the same card at a lower amount and the charges were authorized. The government also presented evidence that Rivera sent EFS fraudulent documentation supporting the charges made to Doil Crabtree's, Anthony Harper's, Kenneth Vaughn's, and Linett Wilkerson's credit cards. In the last instance, Wilkerson testified that she spoke with Rivera and informed him that she did not make any charges on her card. Following this conversation, Rivera still sent the forged documentation to EFS. The jury also heard testimony that when police executed a search of the store, they found three additional blank, signed drafts swiped to Wilkerson's credit cards with a xerox copy of Wilkerson's signature taped over the signature line. Finally, the government presented evidence that the undercover transactions were not isolated events at the shop. In fact, Rudy Ramirez, an employee at the Watch Shop, testified that the store swiped stolen credit cards once or twice a week.

Rivera's actions reveal his knowledge of the fact that the credit card transactions were unauthorized. Placing all the evidence and inferences in the light most favorable to the government's case, there is sufficient evidence in the record for the jury to conclude beyond a reasonable doubt that Rivera had knowledge of the scheme to defraud.

**B**

Rivera next argues that there was insufficient evidence to support his conviction for both

conspiracy to commit money laundering (count one) and for aiding and abetting money laundering (count nine). In order to obtain a conviction for money laundering, the government must prove beyond a reasonable doubt that "the defendant 1) conducted or attempted to conduct a financial transaction, 2) which the defendant knew involved the proceeds of unlawful activity, 3) with the intent [either] to promote or further the unlawful activity." *United States v. Garza*, 42 F.3d 251, 253 (5th Cir. 1994) (quotations omitted); 18 U.S.C. § 1956(a).[5] In order to establish that Rivera aided and abetted money laundering, the government must prove that Rivera "associated himself with the unlawful financial manipulations, that he participated in them as something he wished to bring about, and that he sought, by his actions, to make the effort succeed." *United States v. Delgado*, 256 F.3d 264, 276 (quoting *United States v. Willey*, 57 F.3d 1374, 1383 (5th Cir. 1995)). Rivera "associates" himself with the unlawful financial manipulations if he shares the criminal intent of the principal. *Id.* Rivera "participates" in those manipulations if he engages in some affirmative conduct designed to aid the criminal activity. *Id.* The money laundering conspiracy conviction requires proof that Rivera knew of the conspiracy and voluntarily joined it intending to conduct a financial transaction with the proceeds of the credit card fraud to further the wire fraud scheme. *Ismoila*, 100 F.3d 380 at 387.

In the indictment, the government alleged that Swanson and Rivera caused $850 of the

---

[5]18 U.S.C. § 1956 provides, in relevant part:

> (a)(1) Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity--
>
>> (A)(i) with the intent to promote the carrying on of specified unlawful activity
>
> . . .
>
> shall be sentenced to a fine of not more than $500,000 or twice the value of the property involved in the transaction, whichever is greater, or imprisonment for not more than twenty years, or both.

18 U.S.C. § 1956(a)(1)(A)(i).

proceeds from the wire fraud scheme to be withdrawn from the Bank of Houston. Rivera argues that the government failed to establish beyond a reasonable doubt that he actually conducted the financial transaction at issue and that he knew the money in question represented the proceeds of Swanson's and his wire fraud activities. In addition, Rivera contends that he did not act with the intent to further promote the wire fraud scheme.

To support their money laundering allegations, the government first presented the testimony of its undercover informant, John Dziejak. Dziejak testified that Swanson ran charges on two credit cards provided by Dziejak as part of the government's undercover operation on September 10, 1999. While in the store, Dziejak witnessed Rivera making manual imprints of both these cards. The charges on the two cards totaled $1650.81. The government then presented the Watch Shop's financial records, which show the charged amounts on the two cards being electronically credited to Account #1005391 at the Bank of Houston four days later. Dziejak testified that the following day, he entered the Watch Shop to receive his share of the fraudulent charges at 12:05 P.M. Dziejak, who was wearing a concealed recording device, recorded his conversation with Swanson. On the tape, Swanson was heard making a phone call. He was recorded telling the person over the phone: "Well, if you're at the bank now, just go ahead and get some cash. I need to give this guy some money that we just, uh, did a deal with him." Swanson then told Dziejak that the money would be there in forty-five minutes. Swanson stated: "That's better than waiting for Rudy [Ramirez] to get here, and then sending Rudy down and back." The government then provided the jury with the bank withdrawal receipt, which established that Rivera withdrew $850 from the Bank of Houston at 12:13 P.M., eight minutes after Dziejak had entered the store and moments after Swanson's phone conversation.

Again, viewing this evidence in the light most favorable to the prosecution, there is sufficient

evidence for the jury to conclude that Rivera both aided and abetted and conspired to commit money laundering. First, the evidence establishes that Rivera assisted in processing two stolen credit cards on September 10, 1999. It then establishes that Rivera withdrew $850 from the Bank of Houston immediately following his phone conversation with Swanson. The record indicates that during the phone conversation, Swanson stated that the money was for a person with whom they had just done a deal. Moreover, the amount Rivera withdrew was almost exactly fifty percent of the fraudulent charges he had helped to run five days earlier. In addition to this evidence, the jury also heard testimony about the extensive credit card fraud activities occurring at the Watch Shop on an almost a daily basis.

In sum, there is ample circumstantial evidence from which the jury could infer that Rivera actually withdrew the money at issue, that he knew that the $850 he withdrew was the proceeds of his and Swanson's illegal wire fraud scheme, and that he also was aware that the $850 would be used to further the scheme by paying Dziejak his share of the proceeds. Thus, we conclude that sufficient evidence supports both the jury's verdicts on both of the money laundering charges.

**III**

Rivera next claims that the government improperly commented on his post-arrest silence during its direct examination of Sergeant Larry Doreck. Doreck testified on direct examination that he interviewed Rivera after his arrest. Doreck further stated that he asked Rivera if he had withdrawn the $850 from the Bank of Houston. The prosecutor then asked Doreck whether Rivera "answer[ed] any questions you asked him about the $850." Doreck replied that Rivera had not answered any of his questions.

The Supreme Court has held that the Due Process Clause prohibits the impeachment of a

defendant's exculpatory story using the defendant's post-*Miranda* silence. *See Doyle v. Ohio*, 426 U.S. 610, 619 (1976). "A prosecutor's or witness's remarks constitute comment on a defendant's silence if the manifest intent was to comment on the defendant's silence, or if the character of the remark was such that the jury would naturally and necessarily so construe the remark." *United States v. Shaw*, 701 F.2d 367, 381 (5th Cir. 1983).

Ordinarily, we review prosecutorial comments about a defendant's post-*Miranda* silence under the doctrine of harmless error by determining whether the error was harmless beyond a reasonable doubt. *See United States v. Moreno*, 185 F.3d 465, 472 (5th Cir. 1999). Here, however, Rivera did not object to the prosecutor's questioning. Thus, our review is limited to plain error. *Garcia-Flores*, 246 F.3d at 457 (explaining that when a defendant fails to object to a prosecutor's alleged unconstitutional comment on a defendant's silence, review is for plain error). "Plain error occurs when the error is so obvious and substantial that failure to notice and correct it would affect the fairness, integrity, or public reputation of judicial proceedings and would result in manifest injustice." *United States v. Mizell*, 88 F.3d 288, 297 (5th Cir. 1996). Therefore, in order to overturn Rivera's conviction, we must conclude, first that the prosecutor's comments violated *Doyle* and, if so, that our failure to reverse the conviction would result in a manifest injustice.

In this instance, the prosecutor's comment, which was elicited during direct examination of a witness, was neither repeated nor directly linked with Rivera's exculpatory story that the withdrawal was a legitimate business transaction. Given the evidence of Rivera's guilt adduced at trial, therefore, it is at least possible that the prosecutor's comments on Rivera's silence were harmless. *See Chapman v. United States*, 547 F.2d 1240, 1250 (5th Cir. 1977) ("When there is but a single reference at trial to the fact of defendant's silence, the reference is neither repeated nor linked with defendant's

exculpatory story, and the exculpatory story is transparently frivolous and evidence of guilt is otherwise overwhelming, the reference to defendant's silence constitutes harmless error.").

Nevertheless, even assuming the prosecutor impermissibly commented on Rivera's silence, the single-instance reference did not render the results of the trial manifestly unjust. The prosecution focused on the fact that Rivera's signature was on the withdrawal slip and that the withdrawal occurred moments after Swanson's recorded telephone conversation. Together, this evidence established beyond a reasonable doubt that Rivera withdrew the $850. In addition, moments before the withdrawal, Swanson told Rivera over the phone that "I need to give this guy some money that we just, uh, did a deal with him." From this statement alone, the jury could infer beyond a reasonable doubt that Rivera made the withdrawal with the intent to further his and Swanson's criminal enterprise, and that he had knowledge of the wire fraud scheme. Moreover, the prosecution presented substantial evidence demonstrating Rivera's involvement in numerous wire fraud transactions at the Watch Shop.

Given the strength of the government's evidence establishing that Rivera did, in fact, withdraw the $850 from the bank with the intent to further the wire fraud scheme and the limited context in which the *Doyle* violation supposedly occurred, the failure to correct the error will not result in a manifest injustice or affect the fairness, integrity, or public reputation of judicial proceedings.

**IV**

Finally, Rivera challenges the district court's conclusion that he waived his juror misconduct claim. Rivera argues that one of the jurors slept through significant portions of his trial. During their deliberations, the jury sent out a note regarding the alleged "sleeping" juror. The district court consulted with both the prosecution and Rivera's attorney. The district judge stated that she did not

see the juror sleeping. With the approval of Rivera's attorney, the judge sent the jury a response stating that they should not concern themselves with the issue. The jury then returned their verdict. Following the verdict, Rivera's attorney made a motion for a new trial, claiming that he had an "unobstructed" view of the juror sleeping. The district court, in a written order, denied Rivera's motion, finding first that Rivera had waived his right to object to this misconduct because he did not raise the issue until after the conclusion of the trial.

We review a district court's denial of a motion for a new trial for abuse of discretion. *See Hansen v. Johns-Manville Prods. Corp.*, 734 F.2d 1036 (5th Cir. 1984) (examining claims of juror misconduct). We have repeatedly held that defense counsel must call any juror inattentiveness to the attention of the court when it is first noticed. *See*, *e.g.*, *United States v. Curry*, 471 F.2d 419, 422 (5th Cir. 1973) (holding that "[d]efense counsel had a duty to call a juror's inattentiveness to the court's attention when first noticed. Counsel may not permit juror misconduct or inattentiveness to go unnoticed, thereby sewing a defect into the trial, and later claim its benefit") (citations omitted); *United States v. Baker*, 609 F.2d 134, 139 (5th Cir. 1980) (holding that any juror misconduct claims were waived when "defendants' respective counsel did not mention the point until the jury had retired, and did not urge the court to ascertain whether the juror was actually asleep").

In Rivera's motion for a new trial, his counsel stated that he had an unobstructed view of the juror and witnessed the juror periodically closing his eyes. Nevertheless, counsel did not raise this issue until after the court dismissed two alternate jurors, the trial had concluded, and the jury entered its verdict. Thus, Rivera has waived his juror misconduct claims. The district court did not abuse its discretion by denying Rivera's motion for a new trial.

**V**

We hold that sufficient evidence supports the jury's guilty verdict for the seven counts of aiding and abetting wire fraud, the single count of aiding and abetting money laundering, and the single count of conspiracy to commit money laundering. In addition, we hold that the prosecutor's comments on Rivera's post-*Miranda* silence did not constitute plain error. Finally, we hold that the district court did not abuse its discretion in concluding that Rivera had waived his juror misconduct claim. For the foregoing reasons, Rivera's conviction is AFFIRMED.