# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

March 11, 2011

Lyle W. Cayce
Clerk

No. 09-20491

UNITED STATES OF AMERICA,

Plaintiff-Appellee

v.

CRAIG CURTIS,

Defendant-Appellant

Appeal from the United States District Court
for the Southern District of Texas

Before HIGGINBOTHAM, SMITH, and ELROD, Circuit Judges
PATRICK E. HIGGINBOTHAM, Circuit Judge:

A jury convicted the defendant Craig Curtis of one count of conspiracy to commit wire fraud, three counts of wire fraud, and two counts of aggravated identity theft. The district court sentenced him to 144 months in prison. Curtis alleges five issues on appeal. Finding none to be well-taken, we affirm.

I.

Curtis's convictions arise out of his participation in a criminal conspiracy to commit mortgage fraud. We recite the factual details of that conspiracy in the

light most favorable to the jury's verdict.[1]  The essence of the conspiracy was an agreement to consummate a series of fraudulent real-estate transactions—specifically, purchases of condominiums and townhouses in the midtown area of Houston, Texas.   Curtis and others conspired to obtain mortgage loans in amounts that substantially exceeded the fair market values of the properties the loans were used to purchase.  For each property they purchased, the conspirators would use a portion of the proceeds of the loan to pay off the balance of the construction loan or other first-lien mortgage that was open on the property at the time the conspiracy purchased it.  The rest of the loan proceeds—which would be disbursed to Curtis at each closing—represented the conspiracy's profits.  Curtis would distribute the profits from each purchase among each of the coconspirators who had participated in the transaction.

The Government put on evidence at trial that the conspiracy purchased at least ten properties.  However, the Government prosecuted Curtis for completed wire fraud only as to three of those transactions: purchases of properties located at 2105 Crocker, 704 Welch, and 4420 Austin (all in Houston). The process by which the conspiracy purchased these three properties proceeded in six steps.

First, Curtis obtained control of each property.  He did so either through a consulting agreement or a flip transaction.  Curtis obtained control of 2105 Crocker and 704 Welch through a consulting agreement he entered into with a builder. The agreement authorized him to market the properties and required him to pay a fixed price to the builder ($410,000 for 2105 Crocker and $415,000 for 704 Welch) upon the sale of the properties.  If Curtis was able to negotiate a sale price that exceeded those figures, the consulting agreement allowed him to keep the difference as a fee for his services.  Curtis acquired 4420 Austin through a flip transaction.  Curtis purchased 4420 Austin for $295,000 from a bank that had foreclosed on it.  The very same day he purchased it, he turned

---

[1] *See, e.g.*, *Jackson v. Virginia*, 443 U.S. 307, 318–19 (1979).

around and sold it to one of the straw buyers for $445,000. Curtis obtained payment from the straw buyer before he was required to make payment to the bank, so he was able to use the money he got from the sale to the straw buyer to fund his purchase from the bank.

Second, Curtis located a "straw buyer," the person whose name would be listed as the purchaser on the loan documents. Curtis recruited two of his friends, Melvin Holloway and Trevor Cherry, to serve as the straw buyers for 2105 Crocker and 704 Welch, respectively. For the purchase of 4420 Austin, Curtis used two intermediaries to locate a straw buyer. The intermediaries recruited a woman named Chi Van Nguyen to serve as that property's straw buyer. Because the straw buyers were purchasing the properties with 100 percent financing, they had to have good credit scores (700 or above). Van Nguyen legitimately had a credit score above 700, so she purchased 4420 Austin using her own name and Social Security Number ("SSN"). Holloway and Cherry had poor credit scores, so they enlisted the assistance of a woman named Carlin Joubert, an identity thief who ran what she called a credit-repair business. For a substantial fee, Joubert would take an SSN that had been assigned to a minor and build a phony credit history showing that the SSN was associated with the straw buyer's name and that the straw buyer had a good credit score. Holloway chose to attach his own name to the SSN assigned to a twelve-year-old boy who lived in Arizona, while Cherry attached the name Deondra LeBlanc to the SSN assigned to his nine-year-old son.

Third, the conspiracy secured an appraisal stating an inflated value for the property. Obtaining inflated appraisal reports was a critical leg of the conspiracy, as the conspiracy was only profitable to the extent that it brought in loan proceeds in excess of the properties' fair market values.[2] The Government

---

[2] A mortgage lender will not approve a mortgage loan unless an appraisal report establishes that the property is worth at least as much as the buyer wants to pay for it. The amount of loan proceeds the conspiracy could bring in from any transaction was thus capped

offered little evidence about *how* the conspiracy obtained the inflated appraisal reports, but its evidence left no doubt *that* the values stated in the appraisal reports were in fact inflated. As to the values of the properties located at 2105 Crocker and 704 Welch, the government offered the testimony of Joel Rankin, the Houston real-estate agent who resold both properties on behalf of the lenders who obtained them from the straw buyers in foreclosure. Rankin testified that, based on his twenty-three years of experience as a Houston real-estate agent selling approximately 200 properties a year, it was impossible that either property had ever been worth what the straw buyers paid for them. As to the value of 4420 Austin, the government offered documents showing that Curtis paid $295,000 for the property in an arms-length transaction on the same day that Chi Van Nguyen purchased the property from Curtis for $445,000. Thomas Reardon, an assistant vice president at the lending institution that funded the loan with which Van Nguyen purchased the property from Curtis, testified that the fact that Curtis had been able to purchase the property for $295,000 on the open market established it was not worth $445,000.

Fourth, the straw buyer—with assistance from other participants in the conspiracy—completed a mortgage-loan application. A standard-form mortgage-loan application asks the applicant to provide, *inter alia*, his name, his SSN, the name of his employer, his annual income, and the amounts of any funds he has on deposit in accounts at banks or credit unions. Each of the straw buyers lied in answering one or more of these questions. Melvin Holloway used someone else's SSN, overstated his annual income, and claimed he had funds on deposit at a credit union where he did not have an account. Trevor Cherry used a fabricated name, used someone else's SSN, stated that he was employed by an employer whom he did not work for, and overstated his annual income. Chi Van Nguyen stated that she was employed by an employer whom she did not work

---

at the property value listed in the appraisal report.

for, overstated her annual income, and claimed that funds on deposit with a bank belonged to her when in fact they belonged to someone else.

Fifth, the straw buyer attended a closing and completed the purchase. At each of the closings the straw buyers signed the same set of standard-form documents, including an occupancy affidavit (in which the buyer swears that she intends to use the property she is purchasing as her primary residence) and a promissory note (in which the buyer swears that he intends to repay the principal balance of and interest on the mortgage loan). The evidence at trial established that at the time they signed these documents, Holloway, Cherry, and Van Nguyen neither intended to occupy the properties they were purchasing as their primary residences nor intended to repay the loans they were taking out. Settlement statements from the closings establish that Curtis received a payment of $197,853.05 upon the sale of 2105 Crocker to Melvin Holloway; a payment of $110,918 upon the sale of 704 Welch to Trevor Cherry; and a payment of $135,686.20 upon the sale of 4420 Austin to Chi Van Nguyen.

Finally, after each transaction was complete, Curtis disbursed portions of the proceeds he received at the closing to his fellow coconspirators. After Holloway's purchase of 2105 Crocker closed, Curtis made payments to Holloway and the mortgage broker who handled the transaction (who was also a defendant in this case and pled guilty to conspiring to defraud lenders). Curtis paid Cherry for his purchase of 704 Welch, and after the sale of 4420 Austin he paid Van Nguyen and the two men who recruited her to be a straw buyer.

## II.

The jury found Curtis guilty on six counts: one count of conspiracy to commit wire fraud,[3] three counts of wire fraud,[4] and two counts of aggravated

---

[3] *See generally* 18 U.S.C. §§ 1343 & 371.

[4] *See generally* 18 U.S.C. § 1343.

identity theft.[5]   On appeal, Curtis raises five challenges to the proceedings below.[6]   He contends that (1) the district court should have granted his motion to suppress certain text messages recovered from his cell phone; (2) his right to be present at all phases of the trial was violated because he was not in the courtroom when his attorney exercised his peremptory challenges; (3) the district court abused its discretion by admitting into evidence certain text messages exchanged between two of Curtis's coconspirators; (4) the evidence is insufficient to sustain his convictions; and (5) the district court erred at sentencing when it applied the organizer/leader sentencing enhancement under § 3B1.1(a) of the United States Sentencing Guidelines.  Each of these challenges is without merit.

A.

Curtis argues that the district court erred when it denied his motion to suppress two text messages that were recovered during a search of his cell phone that took place shortly after he was arrested on charges unrelated to the mortgage-fraud conspiracy.  After detailing the factual background of the arrest, we affirm the district court's decision to admit the text messages into evidence.

(1)

In May 2007 Curtis made a false statement on a credit application he submitted to a high-end car dealership where he was attempting to purchase an Aston Martin.  Specifically, Curtis's credit application listed as his Social Security Number an SSN that actually belonged to a seven-year-old girl.  An

---

[5] *See generally* 18 U.S.C. § 1028A.

[6] In his brief, Curtis noted that the district court's copies of the Government's trial exhibits have been lost and argued that he was prejudiced by this loss because we would be unable to review the documents admitted at trial.  However, the Government subsequently filed a motion—which we granted—to supplement the record with its own copies of the trial exhibits.  At oral argument, Curtis conceded that this supplementary submission eliminated any possibility of prejudice.  Therefore, we deem this argument to be waived.  *See generally Jackson v. Watkins*, 619 F.3d 463, 466 n.1 (5th Cir. 2010) (per curiam); *United States v. Amaya*, 111 F.3d 386, 388 n.3 (5th Cir. 1997).

internal investigator at the dealership's bank alerted a Houston-area joint anti-fraud task force to Curtis's fraudulent activity. Vincent Edwards, a Secret Service special agent who was a member of the task force, took charge of the investigation into Curtis. After verifying that the SSN on the application did not belong to Curtis, Edwards subpoenaed Curtis's bank records. Edwards's review of Curtis's bank records led him to believe that Curtis was masterminding a mortgage-fraud scheme.

In July 2007, Edwards and the task force obtained an arrest warrant from Harris County on the state-law charge of false statement to obtain credit. The arrest warrant was not related to Curtis's participation in the mortgage-fraud scheme. Edwards and several other task-force members executed the arrest warrant on Curtis while he was driving. Curtis was talking on his cell phone as he was pulled over. As the officers pulled Curtis out of his car, he placed his cell phone on top of the car's center console. Edwards took the phone out of the car as Curtis was being arrested and began looking through text messages on the phone. The officers then drove back to the Secret Service office, initiated prisoner processing, and attempted to interview Curtis. While Curtis was in the prisoner-processing area, Edwards resumed looking through the text messages on Curtis's phone. He discovered two incoming texts from one of the two men who recruited Chi Van Nguyen to be the straw buyer for 4420 Austin. In the messages, the recruiter told Curtis that they needed to pay Van Nguyen $40,000 so that she would serve as a straw buyer in other transactions. After the district court denied Curtis's motion to suppress the text messages, the Government introduced them at trial as evidence of the existence of a conspiracy in which both the recruiter and Curtis were participants.

(2)

It is undisputed that Edwards did not have a search warrant authorizing him to search the contents of Curtis's phone. The district court concluded that

7

the search was nonetheless constitutional because it took place incident to a lawful arrest. We review that legal conclusion de novo.[7]

Although the Fourth Amendment generally prohibits warrantless searches, "[i]t is well settled that 'in the case of a lawful custodial arrest a full search of the person is not only an exception to the warrant requirement of the Fourth Amendment, but is also a "reasonable" search under that Amendment.'"[8] Incident to a lawful arrest, the police may search: the arrestee's person; any items or containers that were located on the arrestee's person at the time of the arrest; and any items or containers that were located within the arrestee's reaching distance at the time of the arrest.[9] A search is incident to an arrest for "as long as the administrative processes incident to the arrest and custody have not been completed."[10] In other words, a search that could have been "made on the spot at the time of arrest may legally be conducted later when the accused arrives at the place of detention."[11]

In *United States v. Finley*, we held that the police can search the contents of an arrestee's cell phone incident to a valid arrest. In *Finley*, the police arrested the defendant after a reverse-sting drug sale. They searched his person following the arrest and seized a cell phone they found in his pocket. The police then transported the defendant to a different location for questioning. During the questioning, the arresting officer scrolled through the text messages on the defendant's phone. The officer discovered some incriminating text messages that

---

[7] *See, e.g.*, *United States v. Chavez*, 281 F.3d 479, 483 (5th Cir. 2002).

[8] *United States v. Finley*, 477 F.3d 250, 259 (5th Cir.) (quoting *United States v. Robinson*, 414 U.S. 218, 235 (1973)), *cert. denied*, 549 U.S. 1353 (2007).

[9] *Id.* at 260 (collecting cases).

[10] *Id.* at 260 n.7 (citing *United States v. Edwards*, 415 U.S. 800, 804 (1974)).

[11] *Edwards*, 415 U.S. at 803.

were admitted against the defendant at trial.[12]  We concluded that the search of the cell phone's contents was incident to the defendant's arrest and affirmed the decision not to suppress the text messages.[13]  The Fourth,[14] Seventh,[15] and Tenth[16] Circuits have reached the same conclusion on similar facts.

*Finley* forecloses Curtis's argument that the district court should have suppressed the text messages that were recovered from his phone.  Curtis concedes that he was arrested pursuant to a valid Texas arrest warrant and that Edwards recovered the phone from an area that was within Curtis's reaching distance at the time he was arrested.  It is also undisputed that Curtis was still being processed when Edwards scrolled through the text messages.

In his brief, Curtis argued that the district court's decision conflicts with the Supreme Court's holding in *Florida v. Wells* that "an inventory search must not be a ruse for a general rummaging in order to discover incriminating evidence."[17]  But this was not an inventory search.  The police were not cataloguing the items found in portions of Curtis's car outside of his reach.[18] The search extended only to Curtis's person and the area within his immediate

---

[12] *Finley*, 477 F.3d at 24.

[13] *Id.* at 259–60.

[14] *United States v. Murphy*, 552 F.3d 405, 410 (4th Cir.), *cert. denied*, 129 S. Ct. 2016 (2009); *United States v. Young*, 278 F. App'x 242, 245 (4th Cir. 2008) (per curiam) (unpublished).

[15] *United States v. Pineda-Areola*, 372 F. App'x 661, 663 (7th Cir. 2010) (unpublished); *see also United States v. Ortiz*, 84 F.3d 977, 984 (7th Cir. 1996).

[16] *Silvan W. v. Briggs*, 309 F. App'x 216, 225 (10th Cir. 2009) (unpublished).

[17] 495 U.S. 1, 4 (1990) (suppressing evidence that the police discovered during an inventory search by forcing open a locked suitcase they found in the trunk of a car driven by a defendant who had been arrested for driving under the influence).

[18] *See generally Whren v. United States*, 517 U.S. 806, 811 n.1 (1996) ("An inventory search is the search of property lawfully seized and detained, in order to ensure that it is harmless, to secure valuable items (such as might be kept in a towed car), and to protect against false claims of loss or damage.").

control. *Finley* authorizes a police officer to search the electronic contents of a cell phone recovered from the area within an arrestee's immediate control.[19]

At oral argument, Curtis argued that Edwards's search of Curtis's cell phone was unlawful under the new rule announced by the Supreme Court in *Arizona v. Gant*.[20] In *Gant*, the Court held that police may "search a vehicle incident to a recent occupant's arrest only when the arrestee is unsecured and within reaching distance of the passenger compartment at the time of the search."[21] Our sister circuits have divided over whether *Gant* applies solely in the vehicular-search context or whether it generally limits the scope of the search-incident-to-arrest exception.[22] We need not reach this question.[23] Even

---

[19] *See Chimel v. California*, 395 U.S. 752, 763 (1969) (explaining that the police's authority to search an arrestee's person and their authority to search the area within the arrestee's reaching distance "must, of course, be governed by a like rule.").

[20] 129 S. Ct. 1710 (2009).

[21] *Id.* at 1719.

[22] *Compare United States v. Brewer*, 624 F.3d 900, 905–06 (8th Cir. 2010) (declining to apply *Gant* to a search of an arrestee's person)*, petition for cert. filed*, No. 10-9224 (Feb. 24, 2011)*, and United States v. Perdoma*, 621 F.3d 745, 751–52 (8th Cir. 2010) (declining to apply *Gant* to a search of a bag recovered from an area within the arrestee's immediate control), *petition for cert. filed*, No. 10-8844 (Feb. 2, 2011)*, with United States v. Shakir*, 616 F.3d 315, 318 (3d Cir.) ("Because *Gant* involved an automobile search, and because it interpreted *Belton*, another automobile case, the Government contends that the rule of *Gant* applies only to vehicle searches. We do not read *Gant* so narrowly. The *Gant* Court itself expressly stated its desire to keep the rule of *Belton* tethered to the justifications underlying the *Chimel* exception, and *Chimel* did not involve a car search." (internal citation and quotation marks omitted)), *cert. denied*, 131 S. Ct. 841 (2010).

[23] *See United States v. Leon*, 468 U.S. 897, 924–25 (1984) (emphasizing the lower courts' considerable discretion to reject suppression motions solely on good-faith grounds, without reaching the underlying Fourth Amendment question); *United States v. Davis*, 598 F.3d 1259, 1265 (11th Cir.) ("We consider constitutional violations and remedies separately in the Fourth Amendment context . . . ."), *cert. granted*, 131 S. Ct. 502 (2010). *See generally United States v. Emerson*, 270 F.3d 203, 272 (5th Cir. 2001) (Parker, J., specially concurring) ("As federal judges it is our special charge to avoid constitutional questions when the outcome of the case does not turn on how we answer. 'If there is one doctrine more deeply rooted than any other in the process of constitutional adjudication, it is that we ought not to pass on questions of constitutionality unless such adjudication is unavoidable.'" (internal citation, parentheses, and ellipsis omitted) (quoting *Spector Motor Serv., Inc. v. McLaughlin*, 323 U.S. 101, 105 (1944))).

assuming for the sake of argument that *Gant* would have prohibited Edwards's search of Curtis's cell phone, we would decline to suppress the text messages under the exclusionary rule's good-faith exception.

The good-faith exception to the exclusionary rule provides that evidence obtained from an unconstitutional search need not be suppressed "when the offending officers acted in the objectively reasonable belief that their conduct did not violate the Fourth Amendment."[24]  Although the good-faith exception most frequently operates to avoid suppression of evidence obtained in reasonable reliance on a facially valid search warrant, in *United States v. Jackson* this Court—sitting en banc—held that the good-faith exception also applies to a search that was legal at the time it was conducted but has been rendered illegal by an intervening change in the law.[25]  Where "[p]anels of this court have upheld searches" of a particular type and that type of search is later held unconstitutional, "'excluding the evidence will not further the ends of the exclusionary rule in any appreciable way.'"[26]

Three other circuits have declined to use the rule announced in *Gant* to justify suppressing evidence recovered in searches that took place before the date on which *Gant* was decided.[27]  *Jackson* dictates that we follow their lead.

---

[24] *Leon*, 468 U.S. at 918.

[25] *See* 825 F.2d 853, 866 (5th Cir. 1987) (en banc) ("[T]he exclusionary rule should not be applied to searches which relied on Fifth Circuit law prior to the change of that law . . . .").

[26] *Id.* (quoting *Leon*, 468 U.S. at 920 (brackets omitted)); *see also United States v. Buford*, —F.3d—, No. 09-5737, 2011 WL 447048, at *9 (6th Cir. Feb. 10, 2011) ("The fact that appellate precedent is later overturned is not enough to justify suppression, since the 'exclusionary rule is designed to deter police misconduct rather than to punish the errors of judges' . . . ." (quoting *Leon*, 468 U.S. at 916)).

[27] *See Buford*, 2011 WL 447048, at *9 ("[E]xclusion is not the appropriate remedy when an officer reasonably relies on a United States Court of Appeals' well-settled precedent prior to a change of that law."); *United States v. McCane*, 573 F.3d 1037, 1045 (10th Cir. 2009) ("[T]his court declines to apply the exclusionary rule when law enforcement officers act in objectively reasonable reliance upon the settled case law of a United States Court of Appeals.*"), cert. denied*, 130 S. Ct 1686 (2010); *Davis*, 598 F.3d at 1264 ("[T]he exclusionary

At the time that Edwards conducted his search, *Finley* clearly established that an officer who had effected a lawful arrest did not need a search warrant to search through the text messages found on a phone recovered from the area within the arrestee's reaching distance. Based solely on the state of the law at the time of the search,[28] we affirm the denial of Curtis's motion to suppress.[29]

## B.

Curtis next argues that he was not present when his attorney exercised his peremptory challenges and that his absence prevented him from instructing his attorney to strike two venire members who had been victims of credit-card fraud. Because Curtis's attorney did not object to Curtis's absence before submitting his peremptory challenges, we review this issue only for plain error.[30]

Federal Rule of Criminal Procedure 43 codifies the requirement of the Sixth and Fifth Amendments that a criminal defendant must be present at every stage of his trial, "including jury impanelment."[31] The defendant's right to

---

rule does not apply when the police conduct a search in objectively reasonable reliance on our well-settled precedent, even if that precedent is subsequently overturned."). *But see United States v. Gonzalez*, 578 F.3d 1130, 1132 (9th Cir. 2009) (suppressing evidence recovered during a pre-*Gant* search that was lawful under then-controlling precedent), *petition for cert. filed*, No. 10-82 (July 14, 2010). We are aware that the Supreme Court granted certiorari in *Davis* to address precisely this question. Unless and until the Court instructs otherwise, we are bound to apply this Circuit's binding precedent in *Jackson*.

[28] *See Buford*, 2011 WL 447048, at *9 n.9 ("'[O]ur precedent on a given point must be unequivocal before we will suspend the exclusionary rule's operation.'" (quoting *Davis*, 598 F.3d at 1266)).

[29] We express no opinion on the scope of the rule announced in *Gant*, the continuing viability of *Finley* post-*Gant*, or the interaction between *Gant* and *Edwards*, *compare supra* notes 10–11 and accompanying text, *with Gant*, 129 S. Ct. at 1723 ("Police may search a vehicle incident to a recent occupant's arrest only if the arrestee is within reaching distance of the passenger compartment *at the time of the search* or it is reasonable to believe the vehicle contains evidence of the offense of arrest." (emphasis added)).

[30] *See, e.g.*, *United States v. Wilson*, 355 F.3d 358, 362 (5th Cir. 2003) (citing FED. R. CRIM. P. 52(b)).

[31] FED. R. CRIM. P. 43(a)(2).

presence extends to portions of the proceedings not covered by the Confrontation Clause "'to the extent that a fair and just hearing would be thwarted by his absence, and to that extent only.'"[32] One purpose of the right to presence is to protect the defendant's exercise of his peremptory challenges, which means the defendant "should be allowed to obtain as much first hand information as feasible to facilitate his ability to participate in the selection of a jury."[33]

The right to presence imposes two requirements on the exercise of peremptory challenges. First, the defendant must be present for the substantial majority of the jury-selection process.[34] Second, the defendant must be present in the courtroom at the moment when the court gives the exercise of peremptory challenges formal effect by reading into the record the list of jurors who were not struck.[35] Where these requirements are satisfied, a defendant's right to presence

---

[32] *United States v. Gagnon*, 470 U.S. 522, 526 (1985) (quoting *Snyder v. Massachusetts*, 291 U.S. 97, 108 (1934)).

[33] *United States v. Washington*, 705 F.2d 489, 497 (D.C. Cir. 1983) (per curiam).

[34] *See United States v. Alikpo*, 944 F.2d 206, 207 (5th Cir. 1991) (holding that it is error to conduct "most of the jury selection process in the absence of the defendant"); *see also Washington*, 705 F.2d at 497 ("[T]he right of the defense to exercise peremptory challenges, which ordinarily is exercised by counsel, can require direct consultation with the defendant and something more than second hand descriptions of the prospective jurors' responses to questions during voir dire."); *cf. United States v. Fontenot*, 14 F.3d 1364, 1369–70 (9th Cir. 1994) (rejecting a Rule 43(a) challenge brought by a defendant who "was absent from the peremptory challenge conference" on the ground that the defendant "was present for the jury voir dire" and "had the opportunity to discuss his misgivings with counsel during and immediately following voir dire, prior to exercising his peremptory challenges").

[35] *See, e.g.*, *Cohen v. Senkowski*, 290 F.3d 485, 490 (2d Cir. 2002) (holding that the constitutional right to be present is satisfied so long as the defendant "is given an opportunity to register his opinions with counsel after juror questioning and is present when the exercise of strikes is given formal effect," even if the defendant is not present when his lawyer actually exercises the peremptory challenges); *United States v. Gayles*, 1 F.3d 735, 738 (8th Cir. 1993) (holding that the defendant's right to presence was not violated where the defendant had been present in the courtroom while the venire members were questioned, notwithstanding the fact that the defendant "was absent later when his attorney made his strikes over the lunch hour," because the defendant "was present in the courtroom when the clerk gave the strikes effect by reading off the list of jurors who had not been stricken"); *United States v. Bascaro*, 742 F.2d 1335, 1349–50 (11th Cir. 1984) (holding "that the defendants were not denied their right to be present during the peremptory strike phase of jury selection" where they were present during

is not violated by a short absence during one portion of jury selection.

In this case, the district court did not err—much less plainly err—in its conduct of the jury-selection process. The record reveals that Curtis was present for virtually all of jury selection: he was in court when it began and remained there throughout the process—including for the questioning of the venire panel, counsel's exercise of challenges for cause, and the court's allocation of peremptory challenges to the two sides—until a just few moments before the court recessed for lunch. No substantial proceedings took place between the time Curtis left the courtroom and the beginning of the lunch recess. Curtis's attorney did not submit his peremptory challenges until the proceedings had reconvened after lunch. Curtis does not contend that he was absent from the courtroom at that time; his argument focuses entirely on what happened before the lunch recess.[36] He thus concedes that he was present when the peremptory challenges were given formal effect via the impaneling of the jury. Nor does Curtis contend that he was deprived of the opportunity to consult with his attorney before his attorney submitted the peremptory challenges. These facts evince no violation of Curtis's right to be present at every stage of his trial.

## C.

Curtis also contends that the district court erred by admitting transcripts of several text messages sent by Viktor Ly (an indicted coconspirator who was one of the two men who helped recruit Chi Van Nguyen to be the straw buyer of

---

voir dire, had a chance to confer with counsel before the jury was impaneled, and were present in the courtroom "when the peremptory strikes were given actual effect by the clerks' reading off the list"), *abrogated in part on other grounds by United States v. Lewis*, 492 F.3d 1219 (11th Cir. 2007) (en banc).

[36] Nor is there anything in the record to suggest that Curtis was absent when court reconvened after lunch. Indeed, as the Government points out, the district court turned directly from impaneling the jury to giving jury instructions, hearing opening statements, and receiving testimony from the first witness. At no point during any of those proceedings is there any indication that Curtis is not present in the courtroom.

14

4420 Austin) to a woman named Vi Lien Dong. Dong is an unindicted coconspirator who served as the straw buyer for two transactions not at issue on this appeal. Ly told Dong that he would pay the mortgages on the two properties that Dong purchased in those transactions. When he failed to do so, Dong threatened to go to the authorities. In response, Ly sent Dong four angry text messages imploring her not to go to the authorities and warning her that she would make legal trouble for herself if she did. Several months later, Ly sent Dong a final text message in which he laments her decision to tell the Secret Service about the mortgage transactions. At trial, the Government offered the text messages over Curtis's objection as proof of the existence of the conspiracy and as statements made in furtherance of the conspiracy.

Curtis objected to the text messages as unduly prejudicial under Federal Rule of Evidence 403. Rule 403 provides that otherwise relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice." On appeal, Curtis argues that the text messages' probative value was substantially outweighed by their unfairly prejudicial effect because they contain vulgar, angry, threatening, and inculpatory language.

Properly preserved evidentiary objections are reviewed for an abuse of discretion.[37] However, the standard for assigning error under Rule 403 is "'especially high'" and requires a showing of a "'clear abuse of discretion.'"[38] Rare is the appellant who can make that showing. Because "all probative evidence is by its very nature prejudicial"[39] and the Federal Rules of Evidence "embody a

---

[37] *E.g. United States v. Williams*, 620 F.3d 483, 488 (5th Cir. 2010), *cert. denied*, —S. Ct.—, 2011 WL 589399 (Feb. 22, 2011).

[38] *United States v. Sester*, 568 F.3d 482, 495 (5th Cir.) (quoting *United States v. Fields*, 483 F.3d 313, 354 (5th Cir. 2007)), *cert. denied*, 130 S. Ct. 437 (2009).

[39] *United States v. Powers*, 168 F.3d 741, 749 (5th Cir. 1999).

strong and undeniable preference" in favor of admitting probative evidence,[40] district courts should exclude evidence under Rule 403 in very few circumstances.[41]

Curtis has not shown that the district court erred in its application of the Rule 403 balancing test. The probative value of the text messages was high. "[A]cts of concealment done in furtherance of the main criminal objectives of the conspiracy" are circumstantial evidence of the conspiracy's existence.[42] Where, as here, "[t]he central aim of the conspiracy extended to concealing the fraudulent nature of the transaction," then the concealment is "'a necessary part of a conspiracy, so that statements made solely to aid the concealment are in fact made during and in furtherance of the charged conspiracy.'"[43] Ly's statements imploring Dong not to go to the authorities were highly probative of the existence of the conspiracy because they show one of Curtis's admitted coconspirators attempting to facilitate the conspiracy's continued operation by keeping it concealed.[44] In addition, the risk of unfair prejudice was low. The fact

---

[40] *Deluca ex rel. Deluca v. Merrell Dow Pharm., Inc.*, 911 F.2d 941, 956 (3d Cir. 1990), *disapproved of on other grounds by Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993).

[41] *See also Brazos River Auth. v. GE Ionics, Inc.*, 469 F.3d 416, 427 (5th Cir. 2006) ("'Unfair prejudice' as used in rule 403 is not to be equated with testimony that is merely adverse to the opposing party. Virtually all evidence is prejudicial; otherwise it would not be material. The prejudice must be 'unfair.'" (quoting *Dollar v. Long Mfg., N.C., Inc.*, 561 F.2d 613, 618 (5th Cir. 1977))).

[42] *Grunewald v. United States*, 353 U.S. 391, 405 (1957); *see also United States v. Evans*, 572 F.2d 455, 468 (5th Cir. 1978) (explaining that because concealment is one of "the hallmarks of a conspiracy, . . . the objective and observable acts of the conspirators are relevant and competent circumstantial evidence from which the jury may draw the inference of the existence of the agreement or common purpose").

[43] *United States v. Mann*, 161 F.3d 840, 859 (5th Cir. 1998) (quoting *United States v. Del Valle*, 587 F.2d 699, 704 (5th Cir. 1979)); *see also id.* ("[I]n some cases 'the successful accomplishment of the crime necessitates concealment.'" (quoting *Grunewald*, 353 U.S. at 405)).

[44] Curtis does not dispute that the text messages were admissible as the statements of a coconspirator under Federal Rule of Evidence 801(d)(2)(E).

that Ly swore several times and made self-incriminating statements in the text messages was unlikely cause the jury to ignore the evidence and convict Curtis on an emotional basis.[45]   The district court did not err under Rule 403 by admitting the text messages into evidence.

## D.

Next, Curtis contends that the evidence was insufficient to sustain his convictions.  Curtis preserved his sufficiency objection by moving for a judgment of acquittal at the close of the evidence, so our review is de novo.[46]  We determine whether the evidence was sufficient by viewing all of it in the light most favorable to the verdict and asking "whether a rational trier of fact could have found that the evidence established the essential elements of the offense beyond a reasonable doubt."[47]  "This Court reviews jury verdicts with great deference" and "affords the government the benefit of all reasonable inferences and credibility choices."[48]  Curtis advances two separate challenges to the sufficiency of the evidence used to convict him.  Neither has merit.

### (1)

As to his wire-fraud and aggravated-identity-theft convictions, Curtis contends that the evidence was insufficient to establish that he made a false or fraudulent material misrepresentation.[49]  Specifically, Curtis argues that the

---

[45] *See generally* FED. R. EVID. 403 advisory committee's note.

[46] *See, e.g.*, *United States v. Shum*, 496 F.3d 390, 391 (5th Cir. 2007).

[47] *Id.*

[48] *United States v. McCauley*, 253 F.3d 815, 818 (5th Cir. 2001) (citation, internal quotation marks, and brackets omitted).

[49] A false or fraudulent material misrepresentation is an element of the offense of wire fraud—wire fraud requires proof (1) of a scheme to defraud; (2) that the scheme employed false or fraudulent material misrepresentation; and (3) that the scheme utilized an interstate wire communication. *See* 18 U.S.C. § 1343; *Neder v. United States*, 527 U.S. 1, 25 (1999); *United States v. Stalnaker*, 571 F.3d 428, 436 (5th Cir. 2009).  In turn, proof that Curtis committed

17

Government failed to establish that the appraisal reports the conspiracy used to secure financing for the three properties contained false or inflated estimates of the properties' values. Curtis's argument is premised on the assumption that the only evidence the Government submitted of the properties' true fair-market values was Harris County Appraisal District ("HCAD") tax valuations. Curtis is correct that under Texas law, tax valuations are legally insufficient evidence of fair-market value.[50] However, Curtis is incorrect that the HCAD tax valuations were the Government's only evidence that the appraisal reports fraudulently misrepresented the values of the three properties. As discussed above, the Government also offered the testimony of Joel Rankin, a veteran Houston real-estate agent, and Thomas Reardon, a vice president at a mortgage lender, to establish that the conspirators submitted appraisal reports that vastly overstated the values of 2105 Crocker, 704 Welch, and 4420 Austin. Reardon's and Rankin's testimony is sufficient evidence that the true fair-market values of the three properties in question were substantially lower than the values listed in the appraisal reports and that the appraisal reports thus contained false or fraudulent misrepresentations.

Even if Curtis were correct that the HCAD tax valuations were the Government's only evidence that the conspiracy fraudulently misrepresented the properties' value, the evidence would still be sufficient to support his convictions. The Government was not specifically obligated to prove that the values stated in the appraisal reports were falsified or inflated. Rather, it had to prove that Curtis made some kind of a false or fraudulent material misrepresentation in

---

the offense of wire fraud is an element of the offense of aggravated identity theft. *See* 18 U.S.C. § 1028A(a)(1); *Flores-Figueroa v. United States*, 129 S. Ct. 1886, 1888 (2009).

[50] *See, e.g., Dallas Cnty. Bail Bond Bd. v. Black*, 833 S.W.2d 247, 249 (Tex. App.—Dallas 1992, no writ) ("The value placed upon real property for tax assessment purposes, without participation of the landowner, is not evidence of its value for purposes other than taxation. The evidence is considered hearsay and cannot support a finding of fact even without objection at trial." (internal citations omitted)).

service of a scheme to defraud.   And its evidence that the scheme employed material misrepresentations was overwhelming.

The loan applications for these three properties were littered with false, material misrepresentations.  For instance, all three buyers represented that they intended to repay the loans when in fact they did not, that they intended to use the properties as their primary residences when in fact they lived elsewhere, and that they earned substantially more income than they actually earned.  Even putting aside the inflated appraisal reports, each loan application contained at least five false misrepresentations, and the Government offered evidence that all were material to the lenders' decisions to fund the loans.[51] Because Curtis is criminally responsible for these misrepresentations,[52] we conclude that the Government carried its burden of proving that Curtis made false or fraudulent material misrepresentations as part of a scheme to commit interstate wire fraud.

(2)

As to his conviction of conspiracy to commit wire fraud, Curtis contends that the evidence was insufficient to establish that he knowingly and voluntarily joined and participated in the conspiracy.[53]   Here, too, the evidence to the

---

[51] "In general, a false statement is material if it has a natural tendency to influence, or is capable of influencing, the decision of the decisionmaking body to which it was addressed." *Neder*, 527 U.S. at 16 (citation, internal quotation marks, and brackets omitted). Representatives from each of the lending institutions that funded the straw buyers' loans testified that had they known these representations in the loan documents were false, they would not have approved the loans.

[52] Where, as here, the jury charge included an aiding-and-betting instruction, the Government need only establish that the defendant "'assisted the actual perpetrator of the wire fraud crimes while sharing the requisite criminal intent.'" *Stalnaker*, 571 F.3d at 437 (quoting *United States v. Rivera*, 295 F.3d 461, 466 (5th Cir. 2002)).

[53] To convict Curtis of conspiracy to commit wire fraud, the Government was required to prove that (1) Curtis and at least one other person made an agreement to commit the crime of wire fraud; (2) at least one of the conspirators knowingly took an overt act in furtherance of that agreement during the existence of the conspiracy; and (3) Curtis acted with the specific intent to join the conspiracy and commit wire fraud.  *See* 18 U.S.C. § 371; *United States v.*

contrary is overwhelming. It is well-settled that "[c]ircumstantial evidence may establish the existence of a conspiracy, as well as an individual's voluntary participation in it."[54] A jury is free to "infer the existence of a conspiracy from the presence, association, and concerted action of the defendant with others."[55] The defendant's knowing and voluntary participation in the conspiracy can even be established "solely on the basis of the testimony of a coconspirator . . . so long as that testimony is not incredible as a matter of law."[56]

The Government introduced a raft of circumstantial evidence showing that Curtis was an active and willing member of the conspiracy. The evidence adduced at trial established that Curtis was in charge of divvying up the conspiracy's proceeds among his fellow conspirators and that he himself received the lion's share of those proceeds. Curtis recruited two of the straw buyers, hired the two recruiters who eventually located the third straw buyer, and supervised the recruiters' dealings with the third straw buyer. Curtis helped the straw buyers obtain stolen SSNs and forged identification documents. He filled out portions of their loan applications. He recruited a mortgage broker and an identity thief to join the conspiracy, worked with them to falsify various loan documents, and instructed the straw buyers to deal only with that mortgage broker. The common element linking all of the transactions that constituted the conspiracy was Curtis's participation and direction. The evidence was easily sufficient to allow the jury to find that Curtis was a knowing and voluntary participant in the conspiracy.

---

*Stephens*, 571 F.3d 401, 404 (5th Cir. 2009); *United States v. Ingles*, 445 F.3d 830, 838 (5th Cir. 2006); *United States v. Gray*, 96 F.3d 769, 772–73 (5th Cir. 1996).

[54] *United States v. Garcia Abrego*, 141 F.3d 142, 155 (5th Cir. 1998).

[55] *United States v. Gonzales*, 121 F.3d 928, 935 (5th Cir. 1997), *abrogated on other grounds by United States v. O'Brien*, 130 S. Ct. 2169, 2180 (2010), as noted in *United States v. Johnson*, 398 F. App'x 964, 968 (5th Cir. 2010) (per curiam) (unpublished).

[56] *Garcia Abrego*, 141 F.3d at 155.

No. 09-20491

E.

Finally, Curtis argues that the district court erred by enhancing his sentence pursuant to § 3B1.1(a) of the Sentencing Guidelines. Section 3B1.1(a) provides for a four-level increase to the total offense level of a defendant who "was an organizer or leader of a criminal activity that involved five or more participants." The district court's determination that the role Curtis played was that of a leader or organizer of the conspiracy is a finding of fact that we review for clear error.[57]

The commentary to the Guidelines enumerates seven factors that indicate that a defendant served as an organizer or leader of a criminal conspiracy:

> the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others.[58]

The defendant need not have supervised each and every coconspirator: "Proof that the defendant supervised only one other culpable participant is sufficient to make the defendant eligible for the enhancement."[59]  In the context of a criminal mortgage-fraud conspiracy, we held in *United States v. Cooks* that application of the organizer/leader enhancement is appropriate where the defendant located the properties that were the subject of the conspiracy,

---

[57] *See, e.g., United States v. Cabrera*, 288 F.3d 163, 173 (5th Cir. 2002) (per curiam). There are two parts to the § 3B1.1(a) enhancement: the defendant's conduct and the number of participants. A participant is a person who is criminally responsible for the commission of the offense, even if not convicted. *See* U.S. SENTENCING GUIDELINES MANUAL § 3B1.1 cmt. n.1 (2010).  The district court found that there were five or more participants in the conspiracy. Curtis does not challenge that finding on appeal.

[58] U.S. SENTENCING GUIDELINES MANUAL § 3B1.1 cmt. n.4 (2010).

[59] *United States v. Cooper*, 274 F.3d 230, 247 (5th Cir. 2001).

21

recruited other participants, oversaw the production of forged documents, and received the bulk of the profits.[60]

The seven factors enumerated in the Guidelines' commentary and the reasoning of *Cooks* both lend strong support to the district court's decision to apply the § 3B1.1(a) enhancement.  The same evidence introduced at trial to establish that Curtis was a knowing and voluntary participant in the conspiracy also establishes that his was an organizing or leading role.[61]  Further, the district court made specific findings of fact at sentencing that Curtis received the largest share of the conspiracy's profits and actively recruited several accomplices.  These findings were amply supported by the record.  The district court was correct to find that Curtis organized and led the conspiracy and to enhance his sentence under § 3B1.1(a) of the Guidelines.

## III.

For the reasons discussed above, we affirm Curtis's convictions and sentence in all respects.

---

[60] 589 F.3d 173, 185 (5th Cir. 2009), *cert. denied*, 130 S. Ct. 1930 (2010).

[61] *See supra* subsection II(D)(2).