# United States Court of Appeals
## For the First Circuit

---

No. 11-1792

UNITED STATES OF AMERICA,

Appellee,

v.

BRIMA WURIE,

Defendant, Appellant.

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Richard G. Stearns, U.S. District Judge]

---

Before

Howard, Stahl, and Lipez,
Circuit Judges.

---

Ian Gold, Assistant Federal Public Defender, for appellant.
Michael R. Dreeben, Attorney, United States Department of
Justice, with whom Carmen M. Ortiz, United States Attorney, and
Kelly Begg Lawrence, Assistant United States Attorney, were on
brief for appellee.

---

May 17, 2013

---

**STAHL, Circuit Judge**.  This case requires us to decide whether the police, after seizing a cell phone from an individual's person as part of his lawful arrest, can search the phone's data without a warrant.  We conclude that such a search exceeds the boundaries of the Fourth Amendment search-incident-to-arrest exception.  Because the government has not argued that the search here was justified by exigent circumstances or any other exception to the warrant requirement, we reverse the denial of defendant-appellant Brima Wurie's motion to suppress, vacate his conviction, and remand his case to the district court.

## I. Facts & Background

On the evening of September 5, 2007, Sergeant Detective Paul Murphy of the Boston Police Department (BPD) was performing routine surveillance in South Boston.  He observed Brima Wurie, who was driving a Nissan Altima, stop in the parking lot of a Lil Peach convenience store, pick up a man later identified as Fred Wade, and engage in what Murphy believed was a drug sale in the car.  Murphy and another BPD officer subsequently stopped Wade and found two plastic bags in his pocket, each containing 3.5 grams of crack cocaine.  Wade admitted that he had bought the drugs from "B," the man driving the Altima.  Wade also told the officers that "B" lived in South Boston and sold crack cocaine.

Murphy notified a third BPD officer, who was following the Altima.  After Wurie parked the car, that officer arrested

-2-

Wurie for distributing crack cocaine, read him <u>Miranda</u> warnings, and took him to the police station. When Wurie arrived at the station, two cell phones, a set of keys, and $1,275 in cash were taken from him.

Five to ten minutes after Wurie arrived at the station, but before he was booked, two other BPD officers noticed that one of Wurie's cell phones, a gray Verizon LG phone, was repeatedly receiving calls from a number identified as "my house" on the external caller ID screen on the front of the phone. The officers were able to see the caller ID screen, and the "my house" label, in plain view. After about five more minutes, the officers opened the phone to look at Wurie's call log. Immediately upon opening the phone, the officers saw a photograph of a young black woman holding a baby, which was set as the phone's "wallpaper." The officers then pressed one button on the phone, which allowed them to access the phone's call log. The call log showed the incoming calls from "my house." The officers pressed one more button to determine the phone number associated with the "my house" caller ID reference.

One of the officers typed that phone number into an online white pages directory, which revealed that the address associated with the number was on Silver Street in South Boston, not far from where Wurie had parked his car just before he was arrested. The name associated with the address was Manny Cristal.

Sergeant Detective Murphy then gave Wurie a new set of Miranda warnings and asked him a series of questions. Wurie said, among other things, that he lived at an address on Speedwell Street in Dorchester and that he had only been "cruising around" in South Boston. He denied having stopped at the Lil Peach store, having given anyone a ride, and having sold crack cocaine.

Suspecting that Wurie was a drug dealer, that he was lying about his address, and that he might have drugs hidden at his house, Murphy took Wurie's keys and, with other officers, went to the Silver Street address associated with the "my house" number. One of the mailboxes at that address listed the names Wurie and Cristal. Through the first-floor apartment window, the officers saw a black woman who looked like the woman whose picture appeared on Wurie's cell phone wallpaper. The officers entered the apartment to "freeze" it while they obtained a search warrant. Inside the apartment, they found a sleeping child who looked like the child in the picture on Wurie's phone. After obtaining the warrant, the officers seized from the apartment, among other things, 215 grams of crack cocaine, a firearm, ammunition, four bags of marijuana, drug paraphernalia, and $250 in cash.

Wurie was charged with possessing with intent to distribute and distributing cocaine base and with being a felon in possession of a firearm and ammunition. He filed a motion to suppress the evidence obtained as a result of the warrantless

search of his cell phone; the parties agreed that the relevant facts were not in dispute and that an evidentiary hearing was unnecessary. The district court denied Wurie's motion to suppress, United States v. Wurie, 612 F. Supp. 2d 104 (D. Mass. 2009), and, after a four-day trial, the jury found Wurie guilty on all three counts. He was sentenced to 262 months in prison. This appeal followed.

## II. Analysis

In considering the denial of a motion to suppress, we review the district court's factual findings for clear error and its legal conclusions de novo. United States v. Kearney, 672 F.3d 81, 88-89 (1st Cir. 2012).

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures" and provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. The amendment grew out of American colonial opposition to British search and seizure practices, most notably the use of writs of assistance, which gave customs officials broad latitude to search houses, shops, cellars, warehouses, and other places for smuggled goods. The Honorable M. Blane Michael, Reading the Fourth Amendment: Guidance from the Mischief that Gave it Birth, 85 N.Y.U.

L. Rev. 905, 907-09 (2010); see generally William J. Cuddihy, The Fourth Amendment: Origins and Original Meaning 602-1791 (2009).

James Otis, a lawyer who challenged the use of writs of assistance in a 1761 case, famously described the practice as "plac[ing] the liberty of every man in the hands of every petty officer" and sounded two main themes: the need to protect the privacy of the home (what he called the "fundamental . . . Privilege of House"), Michael, supra, at 908 (citations and internal quotation marks omitted), and "the inevitability of abuse when government officials have the sort of unlimited discretion sanctioned by the writ," id. at 909. The Supreme Court has described Otis's argument as "perhaps the most prominent event which inaugurated the resistance of the colonies to the oppressions of the mother country." Boyd v. United States, 116 U.S. 616, 625 (1886).

Today, a warrantless search is per se unreasonable under the Fourth Amendment, unless one of "a few specifically established and well-delineated exceptions" applies. Arizona v. Gant, 556 U.S. 332, 338 (2009) (quoting Katz v. United States, 389 U.S. 347, 357 (1967)) (internal quotation marks omitted). One of those exceptions allows the police, when they make a lawful arrest, to search "the arrestee's person and the area within his immediate control." Id. at 339 (quoting Chimel v. California, 395 U.S. 752, 763 (1969)) (internal quotation marks omitted). In recent years,

courts have grappled with the question of whether the search-incident-to-arrest exception extends to data within an arrestee's cell phone.[1]

## A.   The legal landscape

The modern search-incident-to-arrest doctrine emerged from Chimel v. California, 395 U.S. 752 (1969), in which the Supreme Court held that a warrantless search of the defendant's entire house was not justified by the fact that it occurred as part of his valid arrest.  The Court found that the search-incident-to-arrest exception permits an arresting officer "to search for and seize any evidence on the arrestee's person in order to prevent its concealment or destruction" and to search "the area into which an arrestee might reach in order to grab a weapon or evidentiary items."  Id. at 763.  The justifications underlying the exception, as articulated in Chimel, were protecting officer safety and ensuring the preservation of evidence.  Id.

Four years later, in United States v. Robinson, 414 U.S. 218 (1973), the Supreme Court examined how the search-incident-to-arrest exception applies to searches of the person.  Robinson was arrested for driving with a revoked license, and in conducting a

---

[1] On appeal, Wurie does not challenge the seizure of his phone, and he concedes that, under the plain view exception, see United States v. Paneto, 661 F.3d 709, 713-14 (1st Cir. 2011), the officers were entitled to take notice of any information that was visible to them on the outside of the phone and on its screen (including, in this case, the incoming calls from "my house").

pat down, the arresting officer felt an object that he could not identify in Robinson's coat pocket. Id. at 220-23. He removed the object, which turned out to be a cigarette package, and then felt the package and determined that it contained something other than cigarettes. Upon opening the package, the officer found fourteen capsules of heroin. Id. at 223. The Court held that the warrantless search of the cigarette package was valid, explaining that the police have the authority to conduct "a full search of the person" incident to a lawful arrest. Id. at 235.

Robinson reiterated the principle, discussed in Chimel, that "[t]he justification or reason for the authority to search incident to a lawful arrest rests quite as much on the need to disarm the suspect in order to take him into custody as it does on the need to preserve evidence on his person for later use at trial." Id. at 234. However, the Court also said the following:

> The authority to search the person incident to a lawful custodial arrest, while based upon the need to disarm and to discover evidence, does not depend on what a court may later decide was the probability in a particular arrest situation that weapons or evidence would in fact be found upon the person of the suspect. A custodial arrest of a suspect based on probable cause is a reasonable intrusion under the Fourth Amendment; that intrusion being lawful, a search incident to the arrest requires no additional justification.

Id. at 235.

The following year, the Court decided United States v. Edwards, 415 U.S. 800 (1974). Edwards was arrested on suspicion of burglary and detained at a local jail. After his arrest, police realized that Edwards's clothing, which he was still wearing, might contain paint chips tying him to the burglary. The police seized the articles of clothing and examined them for paint fragments. Id. at 801-02. The Court upheld the search, concluding that once it became apparent that the items of clothing might contain destructible evidence of a crime, "the police were entitled to take, examine, and preserve them for use as evidence, just as they are normally permitted to seize evidence of crime when it is lawfully encountered." Id. at 806.

The Court again addressed the search-incident-to-arrest exception in United States v. Chadwick, 433 U.S. 1 (1977), abrogated on other grounds by California v. Acevedo, 500 U.S. 565 (1991), this time emphasizing that not all warrantless searches undertaken in the context of a custodial arrest are constitutionally reasonable. In Chadwick, the defendants were arrested immediately after having loaded a footlocker into the trunk of a car. Id. at 3-4. The footlocker remained under the exclusive control of federal narcotics agents until they opened it, without a warrant and about an hour and a half after the defendants were arrested, and found marijuana in it. Id. at 4-5. The Court invalidated the search, concluding that the justifications for the

search-incident-to-arrest exception -- the need for the arresting officer "[t]o safeguard himself and others, and to prevent the loss of evidence" -- were absent.  Id. at 14.  The search "was conducted more than an hour after federal agents had gained exclusive control of the footlocker and long after respondents were securely in custody" and therefore could not "be viewed as incidental to the arrest or as justified by any other exigency."  Id. at 15.

Finally, there is the Supreme Court's recent decision in Arizona v. Gant, 556 U.S. 332 (2009).  Gant involved the search of an arrestee's vehicle, which is governed by a distinct set of rules, see id. at 343, but the Court began with a general summary of the search-incident-to-arrest doctrine.  Once again, the Court reiterated the twin rationales underlying the exception, first articulated in Chimel: "protecting arresting officers and safeguarding any evidence of the offense of arrest that an arrestee might conceal or destroy."  Id. at 339 (citing Chimel, 395 U.S. at 763).  Relying on those safety and evidentiary justifications, the Court found that a search of a vehicle incident to arrest is lawful "when the arrestee is unsecured and within reaching distance of the passenger compartment at the time of the search."  Id. at 343.[2]

---

[2] The Court also concluded, "[a]lthough it does not follow from Chimel," that "circumstances unique to the vehicle context justify a search incident to a lawful arrest when it is reasonable to believe evidence relevant to the crime of arrest might be found in the vehicle."  Gant, 556 U.S. at 343 (citation and internal quotation marks omitted).

Courts have struggled to apply the Supreme Court's search-incident-to-arrest jurisprudence to the search of data on a cell phone seized from the person. The searches at issue in the cases that have arisen thus far have involved everything from simply obtaining a cell phone's number, United States v. Flores-Lopez, 670 F.3d 803, 804 (7th Cir. 2012), to looking through an arrestee's call records, United States v. Finley, 477 F.3d 250, 254 (5th Cir. 2007), text messages, id., or photographs, United States v. Quintana, 594 F. Supp. 2d 1291, 1295-96 (M.D. Fl. 2009).

Though a majority of these courts have ultimately upheld warrantless cell phone data searches, they have used a variety of approaches. Some have concluded that, under Robinson and Edwards, a cell phone can be freely searched incident to a defendant's lawful arrest, with no justification beyond the fact of the arrest itself. E.g., People v. Diaz, 244 P.3d 501 (Cal. 2011). Others have, to varying degrees, relied on the need to preserve evidence on a cell phone. E.g., United States v. Murphy, 552 F.3d 405, 411 (4th Cir. 2009); Finley, 477 F.3d at 260; Commonwealth v. Phifer, 979 N.E.2d 210, 213-16 (Mass. 2012). The Seventh Circuit discussed the Chimel rationales more explicitly in Flores-Lopez, assuming that warrantless cell phone searches must be justified by a need to protect arresting officers or preserve destructible evidence, 670 F.3d at 806-07, and finding that evidence preservation concerns

outweighed the invasion of privacy at issue in that case, because the search was minimally invasive, id. at 809.

A smaller number of courts have rejected warrantless cell phone searches, with similarly disparate reasoning. In United States v. Park, No. CR 05-375 SI, 2007 WL 1521573 (N.D. Cal. May 23, 2007), for example, the court concluded that a cell phone should be viewed not as an item immediately associated with the person under Robinson and Edwards but as a possession within an arrestee's immediate control under Chadwick, which cannot be searched once the phone comes into the exclusive control of the police, absent exigent circumstances, id. at *8. In State v. Smith, 920 N.E.2d 949 (Ohio 2009), the Ohio Supreme Court distinguished cell phones from other "closed containers" that have been found searchable incident to an arrest and concluded that, because an individual has a high expectation of privacy in the contents of her cell phone, any search thereof must be conducted pursuant to a warrant, id. at 955. And most recently, in Smallwood v. State, __ So. 3d __, 2013 WL 1830961 (Fla. May 2, 2013), the Florida Supreme Court held that the police cannot routinely search the data within an arrestee's cell phone without a warrant, id. at *10. The court read Gant as prohibiting a search once an arrestee's cell phone has been removed from his person, which forecloses the ability to use the phone as a weapon or to destroy evidence contained therein. Id.

## B.  Our vantage point

We begin from the premise that, in the Fourth Amendment context, "[a] single, familiar standard is essential to guide police officers, who have only limited time and expertise to reflect on and balance the social and individual interests involved in the specific circumstances they confront." Dunaway v. New York, 442 U.S. 200, 213-14 (1979).  The Supreme Court has therefore rejected "inherently subjective and highly fact specific" rules that require "ad hoc determinations on the part of officers in the field and reviewing courts" in favor of clear ones that will be "readily understood by police officers."  Thornton v. United States, 541 U.S. 615, 623 (2004); see also New York v. Belton, 453 U.S. 454, 458 (1981) ("A highly sophisticated set of rules, qualified by all sorts of ifs, ands, and buts and requiring the drawing of subtle nuances and hairline distinctions, may be the sort of heady stuff upon which the facile minds of lawyers and judges eagerly feed, but they may be literally impossible of application by the officer in the field." (citation and internal quotation marks omitted)).  As a result, when it upheld the warrantless search of the cigarette pack in Robinson, "the Court hewed to a straightforward rule, easily applied, and predictably enforced." Belton, 453 U.S. at 459.  Thus, we find it necessary to craft a bright-line rule that applies to all warrantless cell phone

searches, rather than resolving this case based solely on the particular circumstances of the search at issue.[3]

The government seems to agree, urging us to find that a cell phone, like any other item carried on the person, can be thoroughly searched incident to a lawful arrest.[4] The government's reasoning goes roughly as follows: (1) Wurie's cell phone was an item immediately associated with his person, because he was carrying it on him at the time of his arrest (or at least he does not argue otherwise); (2) such items can be freely searched without any justification beyond the fact of the lawful arrest, see Robinson, 414 U.S. at 235; (3) the search can occur even after the defendant has been taken into custody and transported to the

_____

[3] The dissent, advocating a case-by-case, fact-specific approach, relies on Missouri v. McNeely, 133 S. Ct. 1552 (2013), which rejected a per se rule for warrantless blood tests of drunk drivers. But McNeely involved the exigent circumstances exception to the warrant requirement, and courts must "evaluate each case of alleged exigency based 'on its own facts and circumstances.'" Id. at 1559 (quoting Go-Bart Importing Co. v. United States, 282 U.S. 344, 357 (1931)). The Supreme Court explicitly distinguished the exigency exception, which "naturally calls for a case-specific inquiry," from the search-incident-to-arrest exception, which "appl[ies] categorically." Id. at 1559 n.3.

[4] It is worth noting three things that the government is not arguing in this case. First, it does not challenge the district court's finding that what occurred here was a Fourth Amendment search. See Wurie, 612 F. Supp. 2d at 109 ("It seems indisputable that a person has a subjective expectation of privacy in the contents of his or her cell phone."). Second, the government does not suggest that Wurie's expectation of privacy was in any way reduced because his phone was apparently not password-protected. Third, it does not claim that this was an inventory search. See Illinois v. Lafayette, 462 U.S. 640 (1983).

station house, see Edwards, 415 U.S. at 803;[5] and (4) there is no limit on the scope of the search, other than the Fourth Amendment's core reasonableness requirement, see id. at 808 n.9.[6]

This "literal reading of the Robinson decision," Flores-Lopez, 670 F.3d at 805, fails to account for the fact that the Supreme Court has determined that there are categories of searches undertaken following an arrest that are inherently unreasonable because they are never justified by one of the Chimel rationales: protecting arresting officers or preserving destructible evidence.

_____

[5] It is not clear from the record how much time passed between Wurie's arrest and the search of his cell phone at the station house. Nonetheless, because Wurie has not raised the argument, we need not decide whether the government is correct that, under Edwards, the search here was "incident to" Wurie's arrest, despite the delay. See 415 U.S. at 803 ("[S]earches and seizures that could be made on the spot at the time of arrest may legally be conducted later when the accused arrives at the place of detention.").

[6] The government has also suggested a more limited way for us to resolve this case: by holding that this particular search was lawful under United States v. Sheehan, 583 F.2d 30 (1st Cir. 1978). But Sheehan was a seizure case, not a search case, and "[i]t is extremely important to distinguish a search of the person from a seizure of objects found in that search." 3 Wayne R. LaFave, Search & Seizure § 5.2(j), at 185 (5th ed. 2012). The defendant in Sheehan conceded that "the search of his wallet was legal"; he challenged only the seizure of a list of names and telephone numbers in the wallet. 583 F.2d at 31. Because the list was not "a fruit, instrumentality, or contraband, probative of a crime," but rather "mere evidence," we analyzed whether probable cause existed to support the seizure. Id. (citing Warden v. Hayden, 387 U.S. 294 (1967)). The lawfulness of a search of the person incident to arrest, however, does not turn on the likelihood that evidence of the crime of arrest will be discovered. See Robinson, 414 U.S. at 234. The Supreme Court did articulate such a rule in Gant but limited it to the vehicle context. 556 U.S. at 343.

-15-

E.g., Gant, 556 U.S. 332; Chadwick, 433 U.S. 1.  As we explain below, this case therefore turns on whether the government can demonstrate that warrantless cell phone searches, as a category, fall within the boundaries laid out in Chimel.

The government admitted at oral argument that its interpretation of the search-incident-to-arrest exception would give law enforcement broad latitude to search any electronic device seized from a person during his lawful arrest, including a laptop computer or a tablet device such as an iPad.  The search could encompass things like text messages, e.g., Finley, 477 F.3d at 254, emails, e.g., People v. Nottoli, 130 Cal. Rptr. 3d 884, 894 (Cal. Ct. App. 2011), or photographs, e.g., Quintana, 594 F. Supp. 2d at 1295-96, though the officers here only searched Wurie's call log. Robinson and Edwards, the government claims, compel such a finding.

We suspect that the eighty-five percent of Americans who own cell phones and "use the devices to do much more than make phone calls," Maeve Duggan & Lee Rainie, Cell Phone Activities 2012, Pew Internet & American Life Project, 2 (Nov. 25, 2012), http://pewinternet.org/~/media//Files/Reports/2012/PIP_CellActivities_11.25.pdf, would have some difficulty with the government's view that "Wurie's cell phone was indistinguishable from other kinds of personal possessions, like a cigarette package, wallet, pager, or address book, that fall within the search incident to

arrest exception to the Fourth Amendment's warrant requirement."[7]

In reality, "a modern cell phone is a computer," and "a computer . . . is not just another purse or address book." Flores-Lopez, 670 F.3d at 805. The storage capacity of today's cell phones is immense. Apple's iPhone 5 comes with up to sixty-four gigabytes of storage, see Apple, iPhone, Tech Specs, http://www.apple.com/iphone /specs.html (last visited May 16, 2013), which is enough to hold about "four million pages of Microsoft Word documents," Charles E. MacLean, But, Your Honor, a Cell Phone is Not a Cigarette Pack: An Immodest Call for a Return to the Chimel Justifications for Cell Phone Memory Searches Incident to Lawful Arrest, 6 Fed. Cts. L. Rev. 37, 42 (2012).[8]

---

[7] See, e.g., United States v. Ortiz, 84 F.3d 977, 984 (7th Cir. 1996) (pager); United States v. Uricoechea-Casallas, 946 F.2d 162, 166 (1st Cir. 1991) (wallet); United States v. Holzman, 871 F.2d 1496, 1504-05 (9th Cir. 1989) (address book), overruled on other grounds by Horton v. California, 496 U.S. 128 (1990); United States v. Burnette, 698 F.2d 1038, 1049 (9th Cir. 1983) (purse); United States v. Eatherton, 519 F.2d 603, 610-11 (1st Cir. 1975) (briefcase).

[8] We are also cognizant of the fact that "[m]obile devices increasingly store personal user data in the cloud instead of on the device itself," which "allows the data to be accessed from multiple devices and provides backups." James E. Cabral et al., Using Technology to Enhance Access to Justice, 26 Harv. J.L. & Tech. 241, 268 (2012). Though the government insisted at oral argument that it was not seeking a rule that would permit access to information stored in the cloud, we believe that it may soon be impossible for an officer to avoid accessing such information during the search of a cell phone or other electronic device, which could have additional privacy implications. See United States v. Cotterman, 709 F.3d 952, 965 (9th Cir. 2013) (en banc) ("With the ubiquity of cloud computing, the government's reach into private data becomes even more problematic.").

That information is, by and large, of a highly personal nature: photographs, videos, written and audio messages (text, email, and voicemail), contacts, calendar appointments, web search and browsing history, purchases, and financial and medical records. See United States v. Cotterman, 709 F.3d 952, 957 (9th Cir. 2013) (en banc) ("The papers we create and maintain not only in physical but also in digital form reflect our most private thoughts and activities.").[9] It is the kind of information one would previously have stored in one's home and that would have been off-limits to officers performing a search incident to arrest. See Chimel, 395 U.S. 752. Indeed, modern cell phones provide direct access to the home in a more literal way as well; iPhones can now connect their owners directly to a home computer's webcam, via an application called iCam, so that users can monitor the inside of their homes remotely. Flores-Lopez, 670 F.3d at 806. "At the touch of a button a cell phone search becomes a house search, and that is not a search of a 'container' in any normal sense of that word, though a house contains data." Id.

In short, individuals today store much more personal information on their cell phones than could ever fit in a wallet, address book, briefcase, or any of the other traditional containers

---

[9] For cases demonstrating the potential for abuse of private information contained in a modern cell phone, see, for example, Schlossberg v. Solesbee, 844 F. Supp. 2d 1165 (D. Or. 2012), and Newhard v. Borders, 649 F. Supp. 2d 440 (W.D. Va. 2009).

that the government has invoked. See id. at 805 (rejecting the idea that a cell phone can be compared to other items carried on the person, because today's cell phones are "quite likely to contain, or provide ready access to, a vast body of personal data").[10] Just as customs officers in the early colonies could use writs of assistance to rummage through homes and warehouses, without any showing of probable cause linked to a particular place or item sought, the government's proposed rule would give law enforcement automatic access to "a virtual warehouse" of an individual's "most intimate communications and photographs without probable cause" if the individual is subject to a custodial arrest, even for something as minor as a traffic violation. Matthew E. Orso, Cellular Phones, Warrantless Searches, and the New Frontier of Fourth Amendment Jurisprudence, 50 Santa Clara L. Rev. 183, 211 (2010). We are reminded of James Otis's concerns about "plac[ing] the liberty of every man in the hands of every petty officer." Michael, supra, at 908 (citation and internal quotation marks omitted).

---

[10] The record here does not reveal the storage capacity of Wurie's cell phone, but that is of no significance, for two reasons. First, "[e]ven the dumbest of modern cell phones gives the user access to large stores of information." Flores-Lopez, 670 F.3d at 806. Second, neither party has suggested that our holding today should turn on the specific features of Wurie's cell phone, and we find such a rule unworkable in any event. See Thornton, 541 U.S. at 623; Murphy, 552 F.3d at 411 ("[T]o require police officers to ascertain the storage capacity of a cell phone before conducting a search would simply be an unworkable and unreasonable rule.").

It is true that Robinson speaks broadly, and that the Supreme Court has never found the constitutionality of a search of the person incident to arrest to turn on the kind of item seized or its capacity to store private information. In our view, however, what distinguishes a warrantless search of the data within a modern cell phone from the inspection of an arrestee's cigarette pack or the examination of his clothing is not just the nature of the item searched, but the nature and scope of the search itself.

In Gant, the Court emphasized the need for "the scope of a search incident to arrest" to be "commensurate with its purposes," which include "protecting arresting officers and safeguarding any evidence of the offense of arrest that an arrestee might conceal or destroy." 556 U.S. at 339; see also Chimel, 395 U.S. at 762-63 ("When an arrest is made, it is reasonable for the arresting officer to search the person arrested in order to remove any weapons that the latter might seek to use . . . [and] to search for and seize any evidence on the arrestee's person in order to prevent its concealment or destruction."). Inspecting the contents of a cigarette pack can (and, in Robinson, did) preserve destructible evidence (heroin capsules). It is also at least theoretically necessary to protect the arresting officer, who does not know what he will find inside the cigarette pack. Examining the clothing an arrestee is wearing can (and, in Edwards, did) preserve destructible evidence (paint chips). Thus, the searches

-20-

at issue in Robinson and Edwards were the kinds of reasonable, self-limiting searches that do not offend the Fourth Amendment, even when conducted without a warrant.  The same can be said of searches of wallets, address books, purses, and briefcases, which are all potential repositories for destructible evidence and, in some cases, weapons.

When faced, however, with categories of searches that cannot ever be justified under Chimel, the Supreme Court has taken a different approach.  In Chadwick, the Court struck down warrantless searches of "luggage or other personal property not immediately associated with the person of the arrestee" that the police have "reduced . . . to their exclusive control," because such searches are not necessary to preserve destructible evidence or protect officer safety.  433 U.S. at 15.  Similarly, in Gant, the Court concluded that searching the passenger compartment of a vehicle once the arrestee has been secured and confined to a police car neither preserves destructible evidence nor protects officer safety.  556 U.S. at 335; see also id. at 339 ("If there is no possibility that an arrestee could reach into the area that law enforcement officers seek to search, both justifications for the search-incident-to-arrest exception are absent and the rule does not apply.").  The searches at issue in Chadwick and Gant were general, evidence-gathering searches, not easily subject to any limiting principle, and the Fourth Amendment permits such searches

only pursuant to a lawful warrant.  See Thornton, 541 U.S. at 632 (Scalia, J., concurring) ("When officer safety or imminent evidence concealment or destruction is at issue, officers should not have to make fine judgments in the heat of the moment.  But in the context of a general evidence-gathering search, the state interests that might justify any overbreadth are far less compelling.").

We therefore find it necessary to ask whether the warrantless search of data within a cell phone can ever be justified under Chimel.  See Flores-Lopez, 670 F.3d at 806-10 (considering whether either of the Chimel rationales applies to cell phone data searches); cf. United States v. Ortiz, 84 F.3d 977, 984 (7th Cir. 1996) (upholding the warrantless search of a pager incident to arrest because of the risk of destruction of evidence).  The government has provided little guidance on that question.  Instead, it has hewed to a formalistic interpretation of the case law, forgetting that the search-incident-to-arrest doctrine does not describe an independent right held by law enforcement officers, but rather a class of searches that are only reasonable in the Fourth Amendment sense because they are potentially necessary to preserve destructible evidence or protect police officers.  Indeed, the  government has included just one, notably tentative footnote in its brief attempting to place warrantless cell phone data searches within the Chimel boundaries.  We find ourselves unconvinced.

-22-

The government does not argue that cell phone data searches are justified by a need to protect arresting officers. Wurie concedes that arresting officers can inspect a cell phone to ensure that it is not actually a weapon, see Flores-Lopez, 670 F.3d at 806 ("One can buy a stun gun that looks like a cell phone."), but we have no reason to believe that officer safety would require a further intrusion into the phone's contents. As we mentioned earlier, the officer who conducted the search in Robinson had no idea what he might find in the cigarette pack, which therefore posed a safety risk. The officers who searched Wurie's phone, on the other hand, knew exactly what they would find therein: data. They also knew that the data could not harm them.

The government has, however, suggested that the search here was "arguably" necessary to prevent the destruction of evidence. Specifically, the government points to the possibility that the calls on Wurie's call log could have been overwritten or the contents of his phone remotely wiped if the officers had waited to obtain a warrant.[11] The problem with the government's argument

---

[11] The government and our dissenting colleague have also suggested that Wurie's failure to answer calls or to return home after the drug deal might have alerted others to the fact of his arrest and caused them to destroy or conceal evidence (presumably the drug stash later discovered at his home). That is mere speculation, and it is also a possibility present in almost every instance of a custodial arrest; we do not think that such concerns should always justify the search of a cell phone or other electronic device. Furthermore, the risk of destruction, as we understand it, attaches to the evidence that the arrestee is actually carrying on his person -- not to evidence being held or

-23-

is that it does not seem to be particularly difficult to prevent overwriting of calls or remote wiping of information on a cell phone today.  Arresting officers have at least three options.  First, in some instances, they can simply turn the phone off or remove its battery.  See Flores-Lopez, 670 F.3d at 808; Diaz, 244 P.3d at 515 n.24 (Werdegar, J., dissenting).  Second, they can put the phone in a Faraday enclosure, a relatively inexpensive device "formed by conducting material that shields the interior from external electromagnetic radiation."  MacLean, supra, at 50 (citation and internal quotation marks omitted); see also Flores-Lopez, 670 F.3d at 809.  Third, they may be able "to 'mirror' (copy) the entire cell phone contents, to preserve them should the phone be remotely wiped, without looking at the copy unless the original disappears."  Flores-Lopez, 670 F.3d at 809.

Indeed, if there is a genuine threat of remote wiping or overwriting, we find it difficult to understand why the police do not routinely use these evidence preservation methods, rather than risking the loss of the evidence during the time it takes them to search through the phone.  Perhaps the answer is in the government's acknowledgment that the possibility of remote wiping

---

guarded elsewhere by a co-conspirator.  See Gant, 556 U.S. at 339 (describing the need to safeguard "any evidence of the offense of arrest that an arrestee might conceal or destroy" (emphasis added)); Chimel, 395 U.S. at 763 ("In addition, it is entirely reasonable for the arresting officer to search for and seize any evidence on the arrestee's person in order to prevent its concealment or destruction." (emphasis added)).

-24-

here was "remote" indeed.  Weighed against the significant privacy implications inherent in cell phone data searches, we view such a slight and truly theoretical risk of evidence destruction as insufficient.  While the measures described above may be less convenient for arresting officers than conducting a full search of a cell phone's data incident to arrest, the government has not suggested that they are unworkable, and it bears the burden of justifying its failure to obtain a warrant.  See United States v. Jeffers, 342 U.S. 48, 51 (1951).  "[T]he mere fact that law enforcement may be made more efficient can never by itself justify disregard of the Fourth Amendment."  Mincey v. Arizona, 437 U.S. 385, 393 (1978).

Instead of truly attempting to fit this case within the Chimel framework, the government insists that we should disregard the Chimel rationales entirely, for two reasons.

First, the government emphasizes that Robinson rejected the idea that "there must be litigated in each case the issue of whether or not there was present one of the reasons supporting the authority for a search of the person incident to a lawful arrest." 414 U.S. at 235.  That holding was predicated on an assumption, clarified in Chadwick, that "[t]he potential dangers lurking in all custodial arrests" are what "make warrantless searches of items within the 'immediate control' area reasonable without requiring the arresting officer to calculate the probability that weapons or

-25-

destructible evidence may be involved." 433 U.S. at 14-15. For the reasons we just discussed, that assumption appears to be incorrect in the case of cell phone data searches. More importantly, however, we are not suggesting a rule that would require arresting officers or reviewing courts to decide, on a case-by-case basis, whether a particular cell phone data search is justified under Chimel. Rather, we believe that warrantless cell phone data searches are categorically unlawful under the search-incident-to-arrest exception, given the government's failure to demonstrate that they are ever necessary to promote officer safety or prevent the destruction of evidence. We read Robinson as compatible with such a finding.

Second, the government places great weight on a footnote at the end of Chadwick stating that searches of the person, unlike "searches of possessions within an arrestee's immediate control," are "justified by . . . reduced expectations of privacy caused by the arrest." 433 U.S. at 16 n.10. The government reads that footnote as establishing an unlimited principle that searches of items carried on the person require no justification whatsoever beyond a lawful arrest, making Chimel irrelevant in this context. The Chadwick footnote is surely meant to reference similar language in Robinson explaining that, because the "custodial arrest of a suspect based on probable cause is a reasonable intrusion under the

Fourth Amendment[,] . . . a search incident to the arrest requires no additional justification."  414 U.S. at 235.

Yet the Court clearly stated in Robinson that "[t]he authority to search the person incident to a lawful custodial arrest" is "based upon the need to disarm and to discover evidence," id., and Chadwick did not alter that rule.  When the Court decided Robinson in 1973 and Chadwick in 1977, any search of the person would almost certainly have been the type of self-limiting search that could be justified under Chimel.  The Court, more than thirty-five years ago, could not have envisioned a world in which the vast majority of arrestees would be carrying on their person an item containing not physical evidence but a vast store of intangible data -- data that is not immediately destructible and poses no threat to the arresting officers.

In the end, we therefore part ways with the Seventh Circuit, which also applied the Chimel rationales in Flores-Lopez.  Though the court described the risk of evidence destruction as arguably "so slight as to be outweighed by the invasion of privacy from the search," it found that risk to be sufficient, given the minimal nature of the intrusion at issue (the officers had only searched the cell phone for its number).  Flores-Lopez, 670 F.3d at 809.  That conclusion was based, at least in part, on Seventh Circuit precedent allowing a "minimally invasive" warrantless

search.  Id. at 807 (citing United States v. Concepcion, 942 F.2d 1170 (7th Cir. 1991)).

We are faced with different precedent and different facts, but we also see little room for a case-specific holding, given the Supreme Court's insistence on bright-line rules in the Fourth Amendment context.  See, e.g., Thornton, 541 U.S. at 623. A series of opinions allowing some cell phone data searches but not others, based on the nature and reasonableness of the intrusion, would create exactly the "inherently subjective and highly fact specific" set of rules that the Court has warned against and would be extremely difficult for officers in the field to apply.  Id. Thus, while the search of Wurie's call log was less invasive than a search of text messages, emails, or photographs, it is necessary for all warrantless cell phone data searches to be governed by the same rule.  A rule based on particular instances in which the police do not take full advantage of the unlimited potential presented by cell phone data searches would prove impotent in those cases in which they choose to exploit that potential.

We therefore hold that the search-incident-to-arrest exception does not authorize the warrantless search of data on a cell phone seized from an arrestee's person, because the government has not convinced us that such a search is ever necessary to protect arresting officers or preserve destructible evidence.  See Chimel, 395 U.S. at 763.  Instead, warrantless cell phone data

searches strike us as a convenient way for the police to obtain information related to a defendant's crime of arrest -- or other, as yet undiscovered crimes -- without having to secure a warrant. We find nothing in the Supreme Court's search-incident-to-arrest jurisprudence that sanctions such a "general evidence-gathering search." Thornton, 541 U.S. at 632 (Scalia, J., concurring).[12]

There are, however, other exceptions to the warrant requirement that the government has not invoked here but that might justify a warrantless search of cell phone data under the right conditions. Most importantly, we assume that the exigent circumstances exception would allow the police to conduct an immediate, warrantless search of a cell phone's data where they have probable cause to believe that the phone contains evidence of a crime, as well as a compelling need to act quickly that makes it impracticable for them to obtain a warrant -- for example, where the phone is believed to contain evidence necessary to locate a kidnapped child or to investigate a bombing plot or incident. See United States v. Tibolt, 72 F.3d 965, 969 (1st Cir. 1995) (discussing the exigent circumstances exception).

---

[12] We acknowledge that we may have to revisit this issue in the years to come, if further changes in technology cause warrantless cell phone data searches to become necessary under one or both of the Chimel rationales.

## C. The good-faith exception

That leaves only the government's belated argument, made for the first time in a footnote in its brief on appeal, that suppression is inappropriate here under the good-faith exception to the exclusionary rule. See United States v. Leon, 468 U.S. 897 (1984). The government bears the "heavy burden" of proving that the good-faith exception applies, United States v. Syphers, 426 F.3d 461, 468 (1st Cir. 2005), and it did not invoke the exception before the district court.

This is not a case in which an intervening change in the law made the good-faith exception relevant only after the district court issued its opinion. E.g., Davis v. United States, 131 S. Ct. 2419, 2425-26 (2011); United States v. Sparks, 711 F.3d 58, 61-62 (1st Cir. 2013); United States v. Lopez, 453 F. App'x 602, 605 (6th Cir. 2011); see also United States v. Curtis, 635 F.3d 704, 713-14 (5th Cir. 2011) (applying the good-faith exception "to a search that was legal at the time it was conducted but has been rendered illegal by an intervening change in the law"); United States v. McCane, 573 F.3d 1037, 1044 (10th Cir. 2009) (finding that "a police officer who undertakes a search in reasonable reliance upon the settled case law of a United States Court of Appeals, even though the search is later deemed invalid by Supreme Court decision, has not engaged in misconduct"). The government emphasizes that we may affirm the district court's suppression

-30-

ruling on any ground made manifest by the record.  United States v. Doe, 61 F.3d 107, 111–12 (1st Cir. 1995).  In this case, however, we do not believe that ground should be one with respect to which the government bore the burden of proof and entirely failed to carry that burden below, despite the fact that the issue was ripe for the district court's review.[13]

### III. Conclusion

Since the time of its framing, "the central concern underlying the Fourth Amendment" has been ensuring that law enforcement officials do not have "unbridled discretion to rummage at will among a person's private effects."  Gant, 556 U.S. at 345; see also Chimel, 395 U.S. at 767-68.  Today, many Americans store their most personal "papers" and "effects," U.S. Const. amend. IV, in electronic format on a cell phone, carried on the person. Allowing the police to search that data without a warrant any time they conduct a lawful arrest would, in our view, create "a serious and recurring threat to the privacy of countless individuals." Gant, 556 U.S. at 345; cf. United States v. Jones, 132 S. Ct. 945, 950 (2012) ("At bottom, we must 'assur[e] preservation of that degree of privacy against government that existed when the Fourth

---

[13] The government invokes United States v. Grupee, 682 F.3d 143, 148 (1st Cir. 2012), in which we addressed the good-faith exception despite the fact that the district court had not done so in its opinion.  However, the record in that case reveals that the government had raised the good-faith exception below; the district court simply did not reach it.

Amendment was adopted.'" (quoting Kyllo v. United States, 533 U.S. 27, 34 (2001))).

We therefore reverse the denial of Wurie's motion to suppress, vacate his conviction, and remand for further proceedings consistent with this opinion.

**-Dissenting Opinion Follows-**

**HOWARD, <u>Circuit Judge</u>, dissenting**.  Undoubtedly, most of us would prefer that the information stored in our cell phones be kept from prying eyes, should a phone be lost or taken from our hands by the police during an arrest.  One could, individually, take protective steps to enhance the phone's security settings with respect to that information, or for that matter legislation might be enacted to make such unprotected information off-limits to finders or to the police unless they first obtain a warrant to search the phone.  But the question here is whether the Fourth Amendment <u>requires</u> this court to abandon long-standing precedent and place such unprotected information contained in cell phones beyond the reach of the police when making a custodial arrest.  I think that we are neither required nor authorized to rule as the majority has.

Instead, this case requires us to apply a familiar legal standard to a new form of technology.  This is an exercise we must often undertake as judges, for the Constitution is as durable as technology is disruptive.  In this exercise, consistency is a virtue.  Admittedly, when forced to confront the boundaries not only of the Fourth Amendment, but also of the technology in question, it is not surprising that we would look beyond the case at hand and theorize about the long-term effects of our decision.  Yet the implications of our decisions, while important, are ancillary to our constitutionally defined power to resolve each

case as it appears before us. Having scrutinized the relevant Supreme Court decisions, as well as our own precedent, I find no support for Wurie's claim that he had a constitutional right protecting the information obtained during the warrantless search. Nor do I believe that we possess the authority to create such a right. Therefore, I respectfully dissent.

The facts are clear: the police conducted a valid custodial arrest of Wurie; the cell phone was on Wurie's person at the time of the arrest; after seeing repeated calls to Wurie's cell phone from "my house," the police flipped it open and, pressing two buttons, retrieved the associated number.

We have long acknowledged that police officers can extract this type of information from containers immediately associated with a person at the time of arrest. In United States v. Sheehan, 583 F.2d 30 (1st Cir. 1978), police arrested a suspected bank robber and then searched his wallet, which included a piece of paper bearing several names and telephone numbers. Id. at 30-31. The police officers copied this piece of paper, which action Sheehan challenged as an unconstitutional seizure. The claim is made that Sheehan is inapposite to the present case because it concerned a challenge to the seizure, not the search. We, however, did not address the warrantless search in Sheehan because its legality was beyond dispute. Judge Coffin, for the court, noted as an initial matter that "[a]ppellant concedes, as he

-34-

must, that his arrest was lawful and that therefore the search of his wallet was legal." Id. (emphasis added). It is not as though Sheehan left the legality of the search unresolved; rather, the court considered the issue uncontroversial, and therefore provided no elaboration. See also United States v. Uricoechea-Casallas, 946 F.2d 162, 165-66 (1st Cir. 1991) (upholding the warrantless search of a wallet incident to a custodial arrest).

Sheehan was no outlier. Courts have regularly upheld warrantless searches of nearly identical information in a range of "containers." E.g., United States v. Ortiz, 84 F.3d 977, 984 (7th Cir. 1996) (telephone numbers from a pager); United States v. Rodriguez, 995 F.2d 776, 778 (7th Cir. 1993) (address book kept inside a wallet); United States v. Molinaro, 877 F.2d 1341, 1346-47 (7th Cir. 1989) (phone numbers on slips of paper found in a wallet); United States v. Holzman, 871 F.2d 1496, 1504-05 (9th Cir. 1989) (address book), abrogated on other grounds by Horton v. California, 496 U.S. 128 (1990).

The police officers' limited search of one telephone number in Wurie's call log was even less intrusive than the searches in these cases. The police observed, in plain view, multiple calls from "my house" -- a shorthand similar to what millions of cell phone owners use to quickly identify calls instead of the number assigned by the service provider -- to Wurie's cell phone. Only then did they initiate their search and only for the

limited purpose of retrieving the actual phone number associated with "my house."  The police did not rummage through Wurie's cell phone, unsure of what they could find.  Before they had even begun their search, they knew who was calling Wurie and how many times the person had called.  The additional step of identifying the actual telephone number hardly constituted a further intrusion on Wurie's privacy interests, especially since that information is immediately known to the third-party telephone company.  See United States v. Flores-Lopez, 670 F.3d 803, 807 (7th Cir. 2012) (holding that the police could retrieve an arrestee's cell phone number from his phone without a warrant, in part, because "the phone company knows a phone's number as soon as the call is connected to the telephone network; and obtaining that information from the phone company isn't a search because by subscribing to the telephone service the user of the phone is deemed to surrender any privacy interest he may have had in his phone number") (citing Smith v. Maryland, 442 U.S. 735, 742-43 (1979)); see also Matthew E. Orso, Cellular Phones, Warrantless Searches, and the New Frontier of Fourth Amendment Jurisprudence, 50 Santa Clara L. Rev. 183, 210 (suggesting a rule that permits the warrantless search of "call lists and text message addressees" pursuant to an arrest).  This case fits easily within existing precedent.

Nor are there any other persuasive grounds for distinguishing this case from our previous decisions.  That the

container the police searched was a cell phone is not, by itself, dispositive, for "a constitutional distinction between 'worthy' and 'unworthy' containers would be improper."  United States v. Ross, 456 U.S. 798, 822 (1982).  We made a similar observation in United States v. Eatherton, 519 F.2d 603 (1st Cir. 1975), where we upheld the warrantless search of a briefcase incident to an arrest.  Id. at 610-11.  We recognized that a briefcase had some unique characteristics, but explicitly rejected any analysis turning on the nature of the searched container:  "While a briefcase may be a different order of container from a cigarette box, it is not easy to rest a principled articulation of the reach of the fourth amendment upon the distinction. . . . [W]hile [such a distinction] may have analytical appeal, it does not presently represent the law."  Id. at 610 (citations omitted).

Even assuming that cell phones possess unique attributes that we must consider as part of our analysis, none of those attributes are present in this case.  Though we do not know the storage capacity of Wurie's cell phone, we know that the police did not browse through voluminous data in search of general evidence. Nor did they search the "cloud,"[14] or other applications containing particularly sensitive information.  Instead, they conducted a

_____

[14] The government does not claim a right to conduct warrantless searches of information in the cloud.  This is an important concession, for it suggests that the government accepts that there are limits to searches of items found on custodial arrestees.  I discuss my view of those limits later.

focused and limited search of Wurie's electronic call log.  If the information that they sought had been written on a piece of paper, as opposed to stored electronically, there would be no question that the police acted constitutionally, so I see no reason to hold otherwise in this case.  The constitutionality of a search cannot turn solely on whether the information is written in ink or displayed electronically.

The issue of warrantless cell phone searches has come before a number of circuits.  E.g., Flores-Lopez, 670 F.3d at 803-10; United States v. Curtis, 635 F.3d 704, 712 (5th Cir. 2011); Silvan W. v. Briggs, 309 F. App'x 216, 225 (10th Cir. 2009) (unpublished); United States v. Murphy, 552 F.3d 405, 411 (4th Cir. 2009).  None of them have adopted the majority's categorical bar on warrantless cell phone searches.  Instead, they unanimously have concluded that the cell phone searches before them did not violate the Fourth Amendment.

I reach the same conclusion here.  Wurie's cell phone was on his person at the time of the arrest.  The information that the police looked at was of a character that we have previously held searchable during a custodial arrest.  Wurie has made no convincing argument for why this search is any different than the search for phone numbers kept in a wallet or an address book.  Thus, I see no reason to look for complications where none exist; Wurie has not shown a violation of his Fourth Amendment rights.

-38-

In my view, there is another rationale, apparent from the record, for upholding this search:  the risk that others might have destroyed evidence after Wurie did not answer his phone.  Wurie received repeated calls from "my house" in the span of a few minutes after his arrest.  His failure to answer these phone calls could have alerted Wurie's confederates to his arrest, prompting them to destroy further evidence of his crimes.  The majority asserts that this scenario would be present "in almost every instance of a custodial arrest," giving police an ever-ready justification to search cell phones.  Supra at 23 n.11.  On the contrary, the justification is based on the specific facts of this case.  The fact that "my house" repeatedly called Wurie's cell phone provided an objective basis for enhanced concern that evidence might be destroyed and thus gave the police a valid reason to inspect the phone.  See United States v. Chimel, 395 U.S. 752, 762-63 (1969).

This additional reason for affirmance is not a novel one. United States v. Gomez, 807 F. Supp. 2d 1134 (S.D. Fla. 2011), presents a comparable example.  In that case, police officers, after observing multiple phone calls from the same number to an arrested drug dealer's cell phone, first answered the ringing cell phone and thereafter communicated to the caller via text message while posing as the arrestee, which led to the discovery of additional evidence.  Id. at 1139.  The district court denied a

motion to suppress this evidence, holding the police acted according to "the exigencies commensurate with the Defendant's ringing cell phone." Id. at 1152; see also United States v. De La Paz, 43 F. Supp. 2d 370, 375-76 (S.D.N.Y. 1999) (admitting evidence -- under the exigent circumstances exception -- obtained when the police answered an arrestee's cell phone and heard multiple callers identify the arrestee by his drug dealer moniker). The police action in this case is analogous -- arguably less invasive -- and a further reason why Wurie's constitutional challenge founders on the specific facts of this case.

Granted, my fact-specific view does not comport with the all-or-nothing approach adopted by the majority and some state courts, see Smallwood v. State, No. SC11-1130, 2013 WL 1830961 (Fla. May 2, 2013); State v. Smith, 920 N.E.2d 949 (Ohio 2009). But I find the competing rationale unpersuasive.[15] Most pointedly, for the reasons explained above, Wurie himself suffered no constitutional violation during the search. If we are to fashion

---

[15] The insistence on a bright-line rule contrasts with the recent Supreme Court opinion in Missouri v. McNeely, 133 S. Ct. 1552 (2013), which rejected a bright line rule and instead relied on a totality of the circumstances analysis for warrantless blood tests of drunk drivers, id. at 1564 ("[A] case-by-case approach is hardly unique within our Fourth Amendment jurisprudence. Numerous police actions are judged based on fact-intensive, totality of the circumstances analyses rather than according to categorical rules, including in situations that are [] likely to require police officers to make difficult split-second judgments."). While it can be argued that a bright-line rule is preferable, it cannot be claimed that such a rule is necessary.

a rule, it cannot elide the facts before us. "The constitutional validity of a warrantless search is pre-eminently the sort of question which can only be decided in the concrete factual context of the individual case." Sibron v. New York, 392 U.S. 40, 59 (1968). Yet the competing analysis focuses on hypothetical searches that have not emerged in any case or controversy before this court. Those scenarios may one day form the basis of our reasoning in another case, but they cannot govern our analysis of Wurie's claim.

The majority gets around this problem by requiring the government to "demonstrate that warrantless cell phone searches, as a category, fall within the boundaries laid out in Chimel." Supra at 16. It cites United States v. Chadwick, 433 U.S. 1 (1977), abrogated on other grounds by California v. Acevedo, 500 U.S. 565 (1991), and Arizona v. Gant, 556 U.S. 332 (2009), to support this approach. The Supreme Court did hold on those two occasions, neither of which involved the search of items held by the arrestee, that certain types of searches require a warrant because they lack any Chimel justification. But the Supreme Court has not extrapolated from those cases a general rule that the government justify each category of searches under Chimel, nor a requirement that the appellate courts conduct this sort of analysis.

Indeed, if the Supreme Court wishes us to look at searches incident to arrest on a categorical basis, it is curious

-41-

that the Court has offered absolutely no framework for defining what constitutes a distinct category.  Each arrest has its own nuances and variations, from the item searched (as in this case) to the officer's control over it (as was the case in <u>Chadwick</u>), and there could be infinite distinct categories of searches based on these variations.  Yet no relevant criteria are articulated for establishing these categories.  That is not a good way to impose this new paradigm, under which every arrestee is now invited to argue that his search falls into some distinct category and therefore must be justified under <u>Chimel</u>.

Thus, either we are drastically altering the holding in <u>United States</u> v. <u>Robinson</u>, 414 U.S. 218 (1973), by forcing the government to provide a <u>Chimel</u> rationale for practically every search, or we are putting ourselves in the position of deciding, without any conceptual basis, which searches are part of a distinct "category" and which are not.  This runs the risk of spreading confusion in the law enforcement community and multiplying, rather than limiting, litigation pertaining to these searches.

It is argued that the categorical approach flows from the Supreme Court's opinion in <u>Gant</u>, which reaffirmed "the fundamental principles established in the <u>Chimel</u> case regarding the basic scope of searches incident to lawful custodial arrests." <u>Gant</u>, 556 U.S. at 343 (quoting <u>New York</u> v. <u>Belton</u>, 453 U.S. 454, 460 n.3 (1981)). <u>Gant</u> did take a categorical, <u>Chimel</u>-based approach to the search in

question, but its usefulness for our analysis should not be overstated.

As the government points out, the Supreme Court cases treat searches of the arrestee and the items on the arrestee -- as is the case here -- as either not subject to the Chimel analysis, or at a least subject to a lower level of Chimel scrutiny. These cases, unlike Chimel and Gant, are on point with Wurie's case, and we are not free to disregard them in favor of the principles enunciated in Gant. As an inferior court, we are cautioned against "conclud[ing] [that] more recent cases have, by implication, overruled an earlier precedent. . . . [I]f a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions." Agostini v. Felton, 521 U.S. 203, 237 (1997) (internal quotation marks and alterations omitted).

In Robinson, the Supreme Court drew a sharp distinction between two types of searches pursuant to an arrest: searches of the arrestee and searches of the area within his control. "The validity of the search of a person incident to a lawful arrest has been regarded as settled from its first enunciation, and has remained virtually unchallenged . . . . Throughout the series of cases in which the Court has addressed the second [type of search,]

no doubt has been expressed as to the unqualified authority of the arresting authority to search the person of the arrestee." Robinson, 414 U.S. at 224-25. The Supreme Court did state that the basis of this authority is "the need to disarm and to discover evidence," id. at 235, but in the next sentence clarified that "[a] custodial arrest of a suspect based on probable cause is a reasonable intrusion under the Fourth Amendment; that intrusion being lawful, a search incident to the arrest requires no additional justification," id.

Indeed, the Court could not rely on a Chimel justification in Robinson, as the arresting officer conceded that he "did not in fact believe that the object in [Robinson]'s coat pocket was a weapon" and that he gave no thought to the destruction of evidence either. Id. at 251 (Marshall, J., dissenting) (quoting the arresting officer's testimony: "I didn't think about what I was looking for. I just searched him."). Robinson may not have rejected Chimel in the context of searches of an arrestee and items on the arrestee, but it did establish that these searches differ from other types of searches incident to arrest.

The Supreme Court reiterated Robinson's holding in United States v. Edwards, 415 U.S. 800 (1974), in which the Court upheld the search and seizure of an arrestee's clothing ten hours after he was arrested. While most of the analysis focused on the timing of the search, the opinion assumed that law enforcement could "tak[e]

from [the arrestee] the effects in his immediate possession that constituted evidence of crime.  This was and is a normal incident of a custodial arrest . . . ."  Id. at 805; see also id. at 803 ("[B]oth the person and the property in his immediate possession may be searched at the station house after the arrest has occurred . . . .").  Once again, the Supreme Court was unconcerned with the existence or nonexistence of Chimel rationales.  The opinion barely discussed them, and the government did not seek to prove that they were present.  Id. at 811 n.3 (Stewart, J., dissenting) ("No claim is made that the police feared that Edwards either possessed a weapon or was planning to destroy the paint chips on his clothing.  Indeed, the Government has not even suggested that he was aware of the presence of the paint chips on his clothing.").

Even in Chadwick, where the Supreme Court did require the police to obtain a warrant for a category of searches, it continued to treat the search of an arrestee and items immediately associated with him as independently justified by "reduced expectations of privacy caused by the arrest."  Chadwick, 433 U.S. at 16 n.10.  Thus, the holding in Chadwick applied only to "luggage or other personal property not immediately associated with the person of the arrestee."  Id. at 15 (emphasis added).  These cases, taken together, establish that items immediately associated with the arrestee -- as a category -- may be searched without any Chimel justification.  The majority seeks a bright-line rule to govern

-45-

cell phone searches, but denies the fact that such a rule --
covering all items on the arrestee's person -- already exists.

But even if searches of items on an arrestee required
Chimel justifications, I cannot see why cell phones fail to meet
this standard if wallets, cigarette packages, address books,
briefcases, and purses do.  The attempt is made to distinguish cell
phones from these other items, but those distinctions do not hold
up under scrutiny.

One argument is that these other items, unlike cell
phones, all theoretically could contain "destructible" evidence,
which justifies examining them.  But the evidence in a cell phone
is just as destructible as the evidence in a wallet:  with the
press of a few buttons, accomplished even remotely, cell phones can
wipe themselves clean of data.  Any claim that the information is
not destructible strikes me as simply wrong.[16]  Perhaps what is
meant is that the cell phone data is no longer destructible once it
is within the exclusive control of law enforcement officers.  But
even accepting that the likelihood of destruction is reduced to
almost zero once the officers are in control of a cell phone, this

_____

[16] The term "destructible" evidence is perhaps intended to mean
"physical" or "tangible" evidence.  That distinction does not fly,
for two reasons.  First, just because evidence is intangible does
not make it indestructible.  As noted, an arrestee can delete data
just as easily as he can discard drugs.  Second, any distinction
based on the difference between tangible and intangible evidence
ignores the fact that we have upheld the warrantless search of
intangible information during a custodial arrest.  United States v.
Sheehan, 583 F.2d 30, 31 (1st Cir. 1978).

-46-

is equally true of cigarette packages, wallets, address books, and briefcases.  Drugs do not disappear into thin air; weapons do not flee of their own accord.  If that is the basis for the reasoning, then a warrant should be required before searching any object within the exclusive control of the police.  I do not think that the majority is arguing for this rule, but I cannot see any other outcome under its analysis.  Ironically, cell phones arguably pose a greater <u>Chimel</u> risk than most other items because, unlike cigarette packages or wallets, the evidence contained in cell phones remains destructible even after the police have assumed exclusive control of the phone via remote wiping.[17]

Another argument is that because cell phone searches are not "self-limiting," they always require a warrant.  The majority does not precisely define the term "self-limiting," but I gather that it refers to the danger that cell phones, because of their vast storage capabilities, are susceptible to "general, evidence-gathering searches."  <u>Supra</u> at 21 (citing <u>Thornton</u> v. <u>United States</u>, 541 U.S. 615, 632 (2004) (Scalia, J., concurring)).  As an initial matter, this has never been the focus of Supreme Court

---

[17] It is also half-heartedly suggested that containers that hold physical objects, unlike cell phones, pose a risk to officer safety.  "[T]he officer who conducted the search in <u>Robinson</u> had no idea what he might find in the cigarette pack, which therefore posed a safety risk."  <u>Supra</u> at 23.  I find it hard to believe that a reasonable police officer is more justified in remaining on guard against booby-trapped cigarette packs and wallets in the line of duty, than she is against sophisticated electronic devices.

cases discussing the search incident to arrest exception for items immediately associated with the arrestee.[18]  Thus, I am reluctant to give it much weight in assessing Wurie's constitutional claim.

Nonetheless, if we are concerned that police officers will exceed the limits of constitutional behavior while searching cell phones, then we should define those limits so that police can perform their job both effectively and constitutionally.  Instead, the majority has lumped all cell phone searches together, even while perhaps acknowledging that its broad rule may prohibit some otherwise constitutional searches.  Supra at 28 ("Thus, while the search of Wurie's call log was less invasive than a search of text messages, emails, or photographs, it is necessary for all warrantless cell phone data searches to be governed by the same rule.").  But this need not be the solution.  We can draw the appropriate line for cell phone searches, just as we have done in other contexts.  For instance, a body search, like a cell phone search, is not inherently self-limiting.  A frisk can lead to a

---

[18] For instance, in Robinson, the police conducted their search pursuant to a standard operating procedure of the police department, which trained officers to carry out a full field search after any arrest.  United States v. Robinson, 414 U.S. 218, 221 n.2 (1973).  That entailed "completely search[ing] the individual and inspect[ing] areas such as behind the collar, underneath the dollar [sic], the waistband of the trousers, the cuffs, the socks and shoes . . . [as well as] examin[ing] the contents of all the pockets' [sic] of the arrestee . . . ."  Id. (internal quotation marks omitted).  Given that Robinson was arrested for a traffic violation, and that the arresting officer conceded that he felt no personal risk during the arrest, the only conceivable purpose for this search was to gather general evidence.

strip search, which can lead to a cavity search, which can lead to x-ray scanning. But this parade of horribles has not come to pass because we have established the constitutional line, and conscientious law enforcement officers have largely adhered to it. See Swain v. Spinney, 117 F.3d 1, 5-9 (1st Cir. 1997) (holding that police officers may not conduct a strip search of an arrestee incident to the arrest); see also Roberts v. Rhode Island, 239 F.3d 107, 113 (1st Cir. 2001) (holding that indiscriminate strip searches of misdemeanant arrestees during administrative processing at a detention facility violated the Fourth Amendment). The majority has instead chosen to ignore this option in favor of a rule that sweeps too far.

Still, I share many of the majority's concerns about the privacy interests at stake in cell phone searches. While the warrantless search of Wurie's phone fits within one of our "specifically established and well-delineated exceptions," United States v. Camacho, 661 F.3d 718, 724 (1st Cir. 2011) (citations omitted) (internal quotation marks omitted), due to the rapid technological development of cell phones and their increasing prevalence in society, cell phone searches do pose a risk of depriving arrestees of their protection against unlawful searches and seizures. There must be an outer limit to their legality.

In _Flores-Lopez_, Judge Posner suggested that courts should balance the need to search a cell phone against the privacy interests at stake.

> [E]ven when the risk either to the police officers or to the existence of the evidence is negligible, the search is allowed, provided it's no more invasive than, say, a frisk, or the search of a conventional container, such as Robinson's cigarette pack, in which heroin was found.  If instead of a frisk it's a strip search, the risk to the officers' safety or to the preservation of evidence of crime must be greater to justify the search.

_Flores-Lopez_, 670 F.3d at 809 (citations omitted).  I believe that cell phone searches should follow this formula.  That is not to say that the police must prove a risk to officer safety or destruction of evidence in every case.  There is, inherent in every custodial arrest, some minimal risk to officer safety and destruction of evidence.  Moreover, _Chadwick_ states that the arrest itself diminishes the arrestee's privacy rights over items "immediately associated" with the arrestee. _Chadwick_, 433 U.S. at 15.  But the invasion of the arrestee's privacy should be proportional to the justification for the warrantless search.

This approach respects "the Fourth Amendment's general proscription against unreasonable searches and seizures." _Edwards_, 415 U.S. at 808 n.9 (citations omitted) (internal quotation marks omitted).  It is also consistent with the core reasonable limit that has been acknowledged in _Robinson_, which does not permit "extreme or patently abusive" searches, _Robinson_, 414 U.S. at 236, and its offspring, _see, e.g._, _Swain_, 117 F.3d at 5-9.  The Supreme

-50-

Court's recent opinion in Missouri v. McNeely, 133 S. Ct. 1552 (2013), shows that the reasonableness inquiry remains a touchstone of Fourth Amendment analysis. The Court held that, in the context of warrantless blood tests of drunk drivers, courts had to look to "the totality of the circumstances" to determine whether police officers' reliance on the exigency exception was reasonable. Id. at 1558-63.

Similarly, while Robinson's principles generally authorize cell phone searches, and certainly encompass the search in this case, there are reasonable limits to Robinson that we should not hesitate to enforce, especially in light of a cell phone's unique technological capabilities, for "[i]t would be foolish to contend that the degree of privacy secured to citizens by the Fourth Amendment has been entirely unaffected by the advance of technology." Kyllo v. United States, 533 U.S. 27, 33-34 (2001).

I find helpful the analysis in United States v. Cotterman, 709 F.3d 952 (9th Cir. 2013) (en banc). In that case, the Ninth Circuit determined whether a warrantless forensic examination of a laptop computer during a border search violated the Fourth Amendment. The court conducted a reasonableness analysis, balancing the privacy interests of the individual against the sovereign's interests in policing its borders. Id. at 960. It stated that, had the search only involved "turn[ing] on the devices and open[ing] and view[ing] image files . . . we would be inclined

to conclude it was reasonable." Id. at 960-61. However, the invasive nature of the forensics examination, which included restoring previously deleted files, as well as "the uniquely sensitive nature of data on electronic devices," id. at 966, convinced the court that the forensics examination was an unreasonable border search absent a showing of reasonable suspicion, id. at 968.

A similar reasonableness analysis would restrain certain types of cell phone searches under Robinson. The inherent risks in a custodial arrest, along with the reduced privacy expectations of the arrestee, must be balanced against the wide range of private data available in a cell phone. But ultimately the question of what constitutes an unreasonable cell phone search should be left for another day. The majority has outlined some of the more troubling privacy invasions that could occur during a warrantless search. So long as they remain in the hypothetical realm, I think it premature to draw the line. Suffice it to say that, for the reasons I have stated, the search in this case fell on the constitutional side of that line.[19]

_____

[19] If there had been a constitutional violation here, the application of the good faith exception would present an interesting question. Because I would find no constitutional violation, however, I do not address the government's good faith exception argument. But I disagree with the majority's decision not to consider the good faith exception to the extent that it based that decision on the government's failure to invoke the exception before the district court. We may affirm on any basis apparent from the record. See United States v. Sanchez, 612 F.3d.

-52-

**I respectfully dissent.**

---

1, 4 (1st Cir. 2010).  Of course, if the record is underdeveloped because the appellee did not present the issue to the district court, the appellee must suffer the consequences.  See Giordenello v. United States, 357 U.S.  480, 488 (1958) ("To permit the Government to inject its new theory into the case at this stage would unfairly deprive petitioner of an adequate opportunity to respond.  This is so because in the District Court petitioner, being entitled to assume that the warrant constituted the only purported justification for the arrest, had no reason to . . . adduce evidence of his own to rebut the contentions that the Government makes here for the first time.").

Such is not the case here.  The good faith exception is merely an extension of the government's main argument that this search complied with existing law.  The factual record appears sufficiently developed to allow our consideration of this argument, and the government, by raising it in its brief on appeal, gave Wurie the opportunity to respond in his reply brief.  Thus, I would not bypass this argument merely because the government first raised it on appeal.  See Jordan v. U.S. Dep't of Justice, 668 F.3d 1188, 1200 (10th Cir. 2011) (holding that an appellate court may affirm on an alternate ground "provided that the alternate ground is within our power to formulate and the opposing party has had a fair chance to address it") (citations omitted) (internal quotation marks and alterations omitted).